## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

JAMES CHANDLER RYDER,      )
by and through his Next Friend,     )
SUE RYDER,               )
                               )
                Petitioner,   )
                               )
vs.                            )     No. CIV-05-0024-JHP-KEW
                               )
ANITA TRAMMELL, Warden,    )
Oklahoma State Penitentiary,      )
                               )
                Respondent.  )

## OPINION AND ORDER

Petitioner, James Chandler Ryder, was convicted following a jury trial, in the District Court of Pittsburg County, Case No. F-99-147, of First Degree Murder for the murders of Sam Hallum (Count I) and Daisy Hallum (Count II). In accordance with the jury's verdict, Petitioner was, on June 23, 2000, sentenced to death on Count II and to life imprisonment without parole on Count I. On direct appeal, the OCCA affirmed his conviction and sentences. *Ryder v. State*, 83 P.3d 856 (Okla. Crim. App. 2004), *cert. denied*, 543 U.S. 886, 125 S.Ct. 215, 160 L.Ed.2d 146 (2004).

On December 1, 2003, Petitioner filed an Application for Post-Conviction Relief in Oklahoma Court of Criminal Appeals Case No. PCD-2002-257. On March 18, 2004, in an unpublished opinion, the court denied relief. *Ryder v. State*, No. PCD-2002-257, slip op.

(Okla. Crim. App. March 18, 2004).[1]  Petitioner now seeks relief from his death sentence

pursuant to 28 U.S.C. § 2254.

As a preliminary matter the Court notes that Anita Trammell is currently the Warden

at Oklahoma State Penitentiary.  The Court finds, pursuant to Rule 25(d)(1) of the Federal

Rules of Civil Procedure, Anita Trammell is the proper substituted Respondent and the Court

Clerk shall be directed to note such substitution on the record.

## I.  RECORDS REVIEWED

This Court has reviewed (1) the Petition for Writ of Habeas Corpus; (2) the Response

to the Petition filed by the State of Oklahoma; (3) the Reply to the Response filed by the

Petitioner; (4) the Original Record from Pittsburg County District Court, consisting of four

volumes; (5) the transcript of preliminary hearing held on October 28 and November 8, 1999;

(6) the transcript of December 29, 1999; (7) the transcript of March 1, 2000; (8) the transcript

of March 12, 2000;[2] (9) transcript of oral deposition of Cinda Anderson taken on April 18,

2000; (10) transcript of April 25, 2000; (11) transcript of April 28, 2000; (12) transcript of

Jury Trial held on May 1 - 8, 2000, consisting of five volumes; (13) transcript of Sentencing

held on June 21, 2000; (14) transcript of June 28, 2002; (15) transcript of proceedings -

Application to Determine Competency of September 30, 2002; (16) transcript of January 13,

2003; (17) transcript of proceeding held on January 23, 2003; (18) transcript of proceedings

---

[1]*See*, Dkt. # 13-1.

[2]Although the cover of this transcript contains the date of March 12, 2000, it appears this hearing was actually conducted on April 12, 2000.  *See*, page 3 of transcript and the docket sheet entry of April 13, 2000.

held on January 23, 2003; (19) transcript of Post-Competency Jury Trial held on March 13, 2003; and (20) all other records before the Oklahoma Court of Criminal Appeals which were transmitted to this Court, including the briefs filed on Petitioner's behalf with the Oklahoma Court of Criminal Appeals (hereinafter, "OCCA") in both the direct appeal and the post-conviction appeal, as well as other miscellaneous pleadings. Although not listed specifically, all other items filed in this case have been reviewed. See Inventory of State Court Record, Docket No. 24, filed on June 21, 2007.

As a result, this Court finds that the records, pleadings and transcripts of the state proceedings provide all the factual and legal authority necessary to resolve the matters in the petition and, therefore, an evidentiary hearing is unnecessary. *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992); *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981)(*Sumner I*); *Sumner v. Mata*, 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982)(*Sumner II*).

## II. BACKGROUND

### *Factual background*

Historical facts found by the state court are presumed correct, unless the petitioner rebuts the same by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Since Petitioner has failed to rebut the facts, as set forth by the OCCA, this Court hereby adopts the following factual findings made by the Oklahoma appellate court.

During the latter part of 1998, [Petitioner] was hired by Sam and Daisy Hallum to take care of their home and horses while they were out of town. [Petitioner] lived at the Hallum's residence for approximately 4-5 months,

rent-free; in exchange for work he did around the place. During this time, [Petitioner] told friends he was planning to go to the Yukon. [Petitioner] stored his supplies for that trip at the Hallum's residence. These supplies included a trailer, tools, and survival and camping supplies. Prior to April 2, 1999, [Petitioner] left Oklahoma. Upon his return to the state, [Petitioner] sought to get his things from the Hallums. On April 2, 1999, Pittsburg County Sheriff's Deputy Arnold was dispatched to meet [Petitioner] at Highway 9A and McAnally Road to do a "standby" at the Hallum residence. [Petitioner] introduced himself as Mitch Ryder and told Deputy Arnold he had some personal belongings he needed to get from the Hallums.

Upon arrival at the Hallum residence, Deputy Arnold saw Sam Hallum by the gate. Arnold informed Hallum that he and [Petitioner] were there to pick up some personal property that belonged to [Petitioner]. Sam Hallum said he didn't know anything about it, that it was between his mother and [Petitioner]. Deputy Arnold and [Petitioner] proceeded to the house to talk to Daisy Hallum. When Arnold knocked on the door, Daisy answered. She greeted Arnold pleasantly but slammed the door in [Petitioner's] face. Daisy Hallum told Deputy Arnold of her dislike for [Petitioner] and said none of his property was there. She said the property was in storage and she would have it there the next day. Deputy Arnold and [Petitioner] agreed to meet at the same time the next day to retrieve the property.

The following day, April 3, 1999, Deputy Arnold and [Petitioner] returned to the Hallum residence. Daisy Hallum said she did not have [Petitioner's] property at her home. She said it was in a storage building in Eufaula. She gave Arnold the key to the storage building and told him to give it to [Petitioner]. Deputy Arnold gave the key to [Petitioner]. Arnold offered to get a deputy in Eufaula to go with [Petitioner], but [Petitioner] refused. Arnold told [Petitioner] that if his property was not there, to contact him and they would go out and talk to Daisy again. Arnold did not see or hear from [Petitioner] again.

At the storage building, [Petitioner] found only two empty boxes. He returned to Cindy McCord's residence where he had been staying. He retrieved a shotgun and pistol from the garage. McCord did not see [Petitioner] again until the next morning, April 4, when [Petitioner] returned to her home. That afternoon, [Petitioner] packed his personal belongings in his car and told McCord he was going to Atlanta.

On Monday, April 5, Sam and Daisy Hallum advised Deputy Arnold that someone had kicked in their front door. They said personal belongings were strewn all over the house but they did not find anything missing. When asked if they had any suspicions about the perpetrator, Sam said he thought it was "Mitch" [Petitioner].

4

On Thursday, April 8, Cindy McCord saw [Petitioner] in Eufaula. She was surprised to see him, believing he had gone to Atlanta. [Petitioner] told her he had been at a motel for a few days because he had some things to think about and "what he could do." [Petitioner] was dressed in camouflage and black military style boots. [Petitioner] asked McCord if he could put a few of his belongings back in her garage. McCord agreed, and asked [Petitioner] what he was up to. [Petitioner] told her the less she knew the better.

When McCord returned home later that night she saw [Petitioner's] car in her driveway. She also noticed a pile burning near the garage. Inside her home, she found [Petitioner] sitting in a recliner, leaning forward with one elbow propped up and his hand in the air wrapped in a towel. On the floor next to him was a half empty bottle of whiskey. When she asked what had happened, [Petitioner] said he had shot his finger while turkey hunting. [Petitioner] asked McCord to cut his finger off. She refused, telling him he needed to go to the hospital. [Petitioner] said he wasn't going to any hospital, that they would ask too many questions. [Petitioner] repeatedly told McCord that if anyone asked about him, to say that she hadn't seen him since Sunday. McCord helped clean [Petitioner's] injured finger and got him to bed. She had told him he needed to go back to Atlanta like he had said he was going to do. Once [Petitioner] was in bed, she packed his belongings in his car. The next day she remembered she had not seen his guns anywhere. When she asked [Petitioner] about the guns, he merely replied "what guns?" McCord also looked through the pile that had burned and found a piece of camouflage cloth. When she asked [Petitioner] why he had burned his shirt, he said it had gotten too much blood on it. The morning of April 9, McCord left for work and told [Petitioner] that if he were still at her home when she returned that evening, they would talk. McCord did not see [Petitioner] again.

That same morning, McCord received a phone call from a friend who told her that Sam Hallum had been found dead that morning. McCord had an instant "gut feeling" that [Petitioner] was involved. She called the Oklahoma State Bureau of Investigation (OSBI), but by the time the agents arrived at her home, [Petitioner] was gone. He was later located in Georgia.

Shortly after 9:00 a.m. on April 9, Michael Newman, a neighbor of the Hallums, decided to go to the Hallum's residence to retrieve a welding machine. Upon pulling into the driveway, he noticed Sam Hallum laying face down in the front yard. Mr. Newman approached Sam and reached down to shake him awake. However, he noticed Sam was stiff and had blood dripping from him. When he realized Sam was dead, Mr. Newman immediately went to his home and called 911.

Officers from the Pittsburg County Sheriff's Office and the OSBI soon arrived. In addition to finding Sam Hallum dead in the front yard, they found

blood and drag marks on the front porch and around the side of the house. Approximately 100 yards from the house, Daisy Hallum was found laying face down in a small depression. She was partially wrapped in a shower curtain.

The State's investigators and forensic experts testified that based upon the evidence at the crime scene, Daisy Hallum had been beaten in the living room of the house. She was then wrapped in a shower curtain and drug out of the house. The 70 year old woman had numerous lacerations and contusions on her head and face. Her nose and left cheekbone were broken and she had a skull fracture. Her hands were bruised and her fingers fractured and broken, with some fingers almost torn off. The experts called these types of wounds defensive wounds and said they indicated the victim had put her hands up to shield her face. Her cause of death was attributed to blunt force trauma to the head.

The experts testified that 38 year old Sam Hallum suffered multiple gunshot wounds. At least 12 large shotgun pellets were retrieved from his body. The gunshots penetrated his heart, lungs, stomach, liver, pancreas, spleen and left adrenal gland. The gunshot wounds indicated Sam was shot as he faced the house and was in the process of walking when he was struck. His cause of death was attributed to the gunshot wounds to the chest and abdomen.

*Ryder*, 83 P.2d at 860-862. Additional facts will be discussed as needed.

### *Procedural history*

Petitioner, James Chandler Ryder, was charged by Information in the District Court of Pittsburg County, State of Oklahoma, with two counts of First Degree Murder, Case No. F-99-147. At trial, he was represented by Craig Corgan and Wayna Tyner, both with the Oklahoma Indigent Defense System, Capital Trial Division. His trial commenced on May 1, 2000 and concluded on May 8, 2000. The jury returned a verdict of guilty of two counts of First Degree Murder in the deaths of Sam and Daisy Hallum. Following the return of the verdicts of guilt but prior to the second stage of trial, counsel filed an application for a competency evaluation. The trial court held a hearing on the application, found Petitioner competent and continued with the second stage of the trial. After finding the existence of

two aggravating factors in the murder of Daisy Hallum (great risk of death to more than one person and continuing threat), and determining the aggravating circumstances outweighed the mitigating circumstances, the jury recommended a sentence of death on Count 2 and a sentence of life without parole on Count 1. The trial judge sentenced Ryder in accordance with the jury's recommendation on June 23, 2000.

A direct appeal of the conviction and sentences was filed in December, 2000 with the OCCA in Case No. D-2000-886. Ryder was represented by attorney Gloyd McCoy. The appeal raised the following propositions of error:

1. Mr. Ryder was denied a fair trial due to the trial judge's participation in the plea negotiations.

2. Mr. Ryder was denied due process when he was not allowed to be present during key portions of the jury selection; Mr. Ryder was not allowed to be present at side bar conferences with potential jurors and was not allowed to be present when another judge excused a potential juror from jury service.

3. The trial court erred by not making a proper competency determination during the punishment phase of the trial.

4. Trial counsel was ineffective because of the failure to notify the trial judge about doubts regarding Mr. Ryder's competency prior to trial.

5. Mr. Ryder was denied effective assistance of counsel during the second stage of the trial due to the trial court allowing Mr. Ryder to direct his attorneys to not present certain mitigating evidence.

6. The "continuing threat aggravating" circumstance must be invalidated under the double jeopardy principle of collateral estoppel.

7. The "continuing threat" aggravating circumstance is not supported by sufficient evidence.

8. The "great risk of death" aggravating circumstance is not supported by sufficient evidence.

9. Mr. Ryder was denied a fair sentencing proceeding when the prosecutor misstated the law with regard to aggravating circumstances.

10. The death penalty should be modified to life imprisonment.

11. The cumulative effect of the errors justify the reversal of the judgments and sentences.

*See*, Brief of Appellant filed July 24, 2001 in OCCA Case No. D-2000-886. Following oral arguments, the case was remanded to the District Court of Pittsburg "to conduct a feasibility hearing to determine the ability to hold a retrospective competency hearing and, if feasible, hold a retrospective competency hearing." *Ryder*, 83 P.3d, at 860, n. 1.

On June 28, 2002, the feasibility hearing was held and, on March 13, 2003, a jury trial on Ryder's competency at the time of trial was held. The jury found that Petitioner was not incompetent when he originally stood trial. Supplemental O.R. 136-137 and 140. Ryder was represented by Gloyd McCoy during the retrospective competency trial. Thereafter, on January 14, 2004, the OCCA affirmed the conviction and sentences. *Ryder v. State*, 83 P.3d 856 (Okla. Crim. App. 2004).

On December 1, 2003, Ryder filed an application for post-conviction relief with the OCCA, Case No. PCD-2002-257. During this proceeding, Mr. Ryder was represented by Vicki Ruth Adams Werneke and Laura Arledge, with the Capital Post Conviction Division

of the Oklahoma Indigent Defense System. The application raised the following grounds for

relief:

1. Because retrospective competency proceedings violate Oklahoma statutes and the Due Process clause of the Fourteenth Amendment to the United States Constitution, Mr. Ryder's convictions should be reversed and remanded for a new trial.

2. Mr. Ryder's inability to rationally assist trial counsel and counsel's failure to fully investigate rendered their performance ineffective in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

3. Appellate counsel's performance on direct appeal was deficient and deprived Mr. Ryder of full and fair appellate proceedings in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

4. The trial court's failure to instruct the jury that a critical factor in the sentencing stage had to be found beyond a reasonable doubt deprived Mr. Ryder of a fair sentencing determination in violation of the Oklahoma Constitution and the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

5. The trial court violated Mr. Ryder's right to trial by an impartial jury by removing potential jurors for cause, over objection, based on their inability to consider the punishments of death, life, or life without parole equally in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article II, Sections 7 and 20 of the Oklahoma Constitution.

6. Mr. Ryder's right to a fair and impartial tribunal was compromised by the violation of the two-judge rule as articulated in Title 22 O.S. § 576.

7. The cumulative impact of errors identified on direct appeal and post conviction rendered the proceeding resulting in the death sentence arbitrary, capricious, and unreliable. The death sentence in this case constitutes cruel and unusual punishment

> and a denial of due process of law and must be reversed or
> modified to life imprisonment or life without parole.

*See*, Application for Post Conviction Relief filed December 1, 2003 in OCCA Case No. PCD-2002-257. All requested relief was denied in an unpublished opinion. *See*, Opinion Denying Application for Post-Conviction Relief and Evidentiary Hearing (Dkt. # 13-1).

On January 13, 2005, Petitioner initiated this habeas corpus proceeding and on January 14, 2005, the Federal Public Defender's Office was appointed to represent Mr. Ryder. On September 13, 2005, a petition for writ of habeas corpus was filed herein (Dkt. # 13). In said petition, counsel advised the court that Mr. Ryder was presently incompetent and requested the Court equitably toll the statute of limitations and hold the case in abeyance until Mr. Ryder's competency was restored (Dkt. # 13). On September 21, 2007, Petitioner filed a Motion for Equitable Tolling and Abeyance (Dkt. # 25). The State filed a response in opposition (Dkt. # 26). On October 15, 2007, Petitioner filed a reply (Dkt. # 27).

On December 14, 2007, the matter was referred to the United States Magistrate Judge for the purpose of holding a competency hearing (Dkt. # 29). A status and scheduling conference was held on January 9, 2008 and the Magistrate Judge entered an order for psychiatric examination (Dkt. # 34). Following entry of the magistrate judge's report and recommendation (Dkt. # 103), this Court held an evidentiary hearing on March 12, 2012. Thereafter, on September 28, 2012, this Court affirmed the magistrate judge's report and recommendation. In affirming the magistrate judge, this Court found the petitioner had

become legally incompetent since the filing of his petition herein, appointed Sue Ryder as "next friend" and denied petitioner's request for equitable tolling (Dkt. # 150).

The Petition (Doc. #13) filed herein on September 13, 2005 raises eleven (11) grounds for relief. On December 12, 2005, Respondent, by and through the Attorney General of the State of Oklahoma, filed a Response (Doc. #18) to the Petition. Petitioner filed a Reply (Doc. #19) on January 12, 2006. Specifically, Petitioner alleges the following errors entitle him to habeas relief: (1) Petitioner was deprived of his right to due process and a fair trial under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution as a result of the procedures employed in determining he was competent to stand trial when, according to Petitioner, he was actually incompetent to stand trial; (2) counsel rendered ineffective assistance by failing to fully investigate Petitioner's background and recognize his incompetence; (3) trial court erred in removing certain jurors for cause thereby violating his Sixth, Eighth, and Fourteenth Amendment rights; (4) trial court's error in allowing the jury to consider the continuing threat aggravating factor violated his due process rights; (5) insufficient evidence to support the continuing threat aggravator; (6) insufficient evidence to support the great risk of death aggravating circumstance; (7) improper jury instructions violated Petitioner's Sixth, Eighth, and Fourteenth Amendment rights; (8) prosecutorial misconduct deprived Petitioner of a fundamentally fair and reliable sentencing hearing; (9) the cumulative effect of the aforementioned errors deprived Petitioner of his constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution; (10)

Petitioner's execution would violate the Eighth Amendment because he is incompetent to be executed; and (11) Oklahoma's lethal injection protocols violate the Eighth Amendment.

## III. GENERAL CONSIDERATIONS

### A. Exhaustion

Federal law requires that persons in custody pursuant to a state court judgment exhaust all available state court remedies prior to seeking federal habeas corpus relief. 28 U.S.C. § 2254(b)(1)(A); *Selsor v. Workman*, 644 F.3d 984 (10th Cir. 2011); *see also*, *Wainright v. Sykes*, 433 U.S. 72, 80-81, 97 S.Ct. 2497, 2503, 53 L.Ed.2d 594 (1977) and *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982) (both of these cases review historical perspective of exhaustion requirement). Where a state prisoner has not properly exhausted his state remedies, federal courts will generally not consider the application for writ of habeas corpus unless exhaustion would have been futile because of either "an absence of available State corrective process"[3] or "circumstances exist that render such process ineffective to protect the rights of the applicant."[4] "The state prisoner bears the burden of proving that he exhausted state court remedies, or that exhaustion would have been futile." *Selsor*, 644 F.3d at 1026 (citations omitted). The principal purpose of the exhaustion-of-state remedies requirement is "to protect the state court's role in the enforcement of federal law and prevent disruption of state judicial proceedings." *Rose v. Lundy*, 455 U.S. at 518, 102 S.Ct. at 1203; *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Where,

---

[3] 28 U.S.C. § 2254(b)(1)(B)(i).

[4] 28 U.S.C. § 2254(b)(1)(B)(ii).

however, a procedural bar would be applied by the court to which the petitioner would be required to present his unexhausted claims, a federal habeas court can conduct a procedural bar analysis in lieu of requiring exhaustion. *Id*., 501 U.S. at 735 n. 1.

Respondent contends that some of the petitioner's claims are unexhausted. Therefore, this Court will address the threshold question of exhaustion as to each claim where appropriate.

## B. *Procedural Bar*

As a general rule, if a petitioner has failed to present a claim to the state courts in the manner prescribed by the procedural rules of the state, the state court may deem the claim defaulted. Where a state prisoner defaults his federal claims in state court based upon an independent and adequate state procedural rule, federal review of his habeas claims will be barred. *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 2553-54, 115 L.Ed.2d 640 (1991). If the state court's finding is separate and distinct from federal law, it will be considered "independent." *See Ake v. Oklahoma*, 470 U.S. 68, 75, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); *Duvall v. Reynolds*, 139 F.3d 768 (10th Cir. 1998), *cert. denied,* 525 U.S. 933, 119 S.Ct. 345, 142 L.Ed.2d 284 (1998). If the finding is applied "evenhandedly to all similar claims," it will be considered "adequate." *Maes v. Thomas*, 46 F.3d 979 (10th Cir. 1995), *cert. denied* 514 U.S. 1115, 115 S.Ct. 1972, 131 L.Ed.2d 861 (1995) (citing *Hathorn v. Lovorn*, 457 U.S. 255, 263, 102 S.Ct. 2421, 2426, 72 L.Ed.2d 824 (1982)). Where the state-law default prevented the state court from reaching the merits of the federal claim, the claim ordinarily cannot be reviewed in the federal courts. *Ylst v. Nunnemaker*, 501 U.S. 797,

111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). "Review is precluded 'unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.'" *See Breechen v. Reynolds*, 41 F.3d 1343, 1353 (10th Cir. 1994), *cert. denied*, 515 U.S. 1135, 115 S.Ct. 2564, 132 L.Ed.2d 817 (1995) and cases cited therein. As noted in *Jackson v. Shanks*, 143 F.3d 1313, 1317 (10th Cir. 1998), *cert. denied,* 525 U.S. 950, 119 S.Ct. 378, 142 L.Ed.2d 312 (1998), the procedural default rule is not a jurisdictional rule; rather, it is based upon the principles of comity and federalism.

## C. *Standard of Review*

Since Petitioner filed his petition in September, 2005, this case is governed by the statute as amended by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). *See Lindh v. Murphy,* 521 U.S. 320, 326-327, 117 S.Ct. 2059, 2063, 138 L.Ed.2d 481 (1997). The AEDPA made significant changes to federal habeas corpus law, specifically delineating the circumstances under which a federal court may grant habeas relief. Under the AEDPA's provisions, this Court is precluded from granting habeas relief on any claim adjudicated on the merits by a state court

> unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Furthermore, determinations of factual issues made by state courts are presumed correct and a habeas petitioner must rebut this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

In *Williams v. Taylor*, 592 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the United States Supreme Court interpreted the above-quoted statute holding, in order for a petitioner to obtain federal habeas relief, the petitioner must first demonstrate that his case satisfies the conditions set by § 2254(d)(1). The starting point is to determine whether there was clearly established federal law at the time the conviction became final, as set forth in the holdings, as opposed to the dicta, of the Supreme Court. *Marshall v. Rodgers*, — U.S. —, 133 S.Ct. 1446, 1449, 185 L.Ed.2d 540 (2013) and *Carey v. Musladin*, 549 U.S. 70, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006). *See also, House v. Hatch*, 527 F.3d 1010, 1016-17 (10th Cir. 2008). If no clearly established federal law exists, this Court need not address whether the state court's decision was "contrary to" or involved an "unreasonable application" of such law. *Id.*, at 1018. Where, however, clearly established federal law exists, this Court must then consider whether the state court decision was "contrary to" or involved an "unreasonable application" of such law. *Id.*

A decision can be "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court case law or "if the state confronts a set of facts that are materially indistinguishable from" a decision of the Supreme Court, but nonetheless arrives at a different result. *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (citing *Williams,* 529 U.S. at 405-406). When the state

court applies the correct federal law to deny relief, the federal court can consider only whether the state court applied the federal law in an objectively reasonable manner. *See*, *Bell v. Cone*, 535 U.S. 685, 699, 122 S.Ct. 1843, 1852, 152 L.Ed.2d 914 (2002); *Hooper v. Mullin*, 314 F.3d 1162, 1169 (10th Cir. 2002).

On the other hand, the "unreasonable application" provision is implicated when "the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407, 120 S.Ct. at 1520. "The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct.1933, 1939, 167 L.Ed.2d 836 (2007), *reh. denied*, 551 U.S. 1177, 128 S.Ct. 7, 168 L.Ed.2d 784 (2007). In *Renico v. Lett*, 559 U.S. 766, 130 S.Ct. 1855, 176 L.Ed.2d 678 (2010), the Supreme Court reiterated two principles. First, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law" and; second, the AEDPA "imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Id.*, 559 U.S. at 773, 130 S.Ct. at 1862 (citations omitted).

Moreover, the Supreme Court has made it clear that a state court is not required to cite Supreme Court caselaw, or even be aware of it, "so long as neither the reasoning nor the

result of the state-court decision contradicts [Supreme Court precedent]." *Early*, 537 U.S. at 8, 123 S.Ct. at 365. Additionally, the Supreme Court has recently held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, — U.S. —, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011). Accordingly, "evidence introduced in federal court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Id.*, 131 S.Ct. at 1440 (footnote omitted).

The second prong of § 2254(d) requires the Court to review any factual findings of the state court to determine if they were unreasonable in light of the evidence presented at trial. Since factual findings made by a state court are presumed correct and a habeas petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence",[5] state court factual determinations should not be deemed unreasonable simply "because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301, 130 S.Ct. 841, 849, 175 L.Ed.2d 738 (2010). Even where "'[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . . determination.'" *Id.* (citing *Rice v. Collins*, 546 U.S. 333, 341-342, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006)).

---

[5]28 U.S.C. § 2254(e)(1).

# IV.  PETITIONER'S GROUNDS FOR RELIEF

## 1.  Competency to Stand Trial

In his first ground for relief, the petitioner asserts that he was incompetent to stand trial and the procedures employed by the State of Oklahoma to assess his competency violated his due process rights.  Thus, the petitioner's claim is both a substantive as well as a procedural competency challenge.  Respondent argues, because the petitioner was granted a retrospective competency hearing in which the jury found the petitioner was competent, the petitioner's claim has no merit.

It has long been held that criminal trial of an incompetent defendant violates the due process clause of the Fourteenth Amendment.  *Medina v. California*, 505 U.S. 437, 439, 112, S.Ct. 2572, 2574, 120 L.Ed.2d 353 (1992); *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966).  In *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), the Supreme Court held the standard in determining competency is "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him."  *Id*.

"A procedural competency claim is founded upon a trial court's alleged failure to hold a competency hearing, or an adequate competency hearing, while a substantive competency claim is premised upon the allegation that an individual was tried and convicted while, in

fact, incompetent." *McGregor v. Gibson*, 248 F.3d 946, 952 (10th Cir. 2001) (citing *Walker v. Att'y Gen.*, 167 F.3d 1339, 1343-44 (10th Cir. 1999)).

## A. Procedural competency claim

To prevail on a procedural competency claim after a trial, "a petitioner must raise a 'bona fide doubt' regarding his competency to stand trial at the time of the conviction." *McGregor v. Gibson*, 248 F.3d 946, 953 (10th Cir. 2001). In *Nguyen v. Reynolds*, 131 F.3d 1340 (10th Cir. 1997), the Court said "[i]n order . . . to raise such doubt, [the petitioner] must present facts sufficient 'to positively, unequivocally and clearly generate a real, substantial and legitimate doubt' concerning his mental capacity." *Id.*, at p. 1346 (quoting *United States v. Williams*, 819 F.2d 605, 609 (5th Cir. 1987)). This Court is required to "view the evidence in the record objectively, from the standpoint of a reasonable judge presiding over petitioner's case at the time of trial." *McGregor*, 248 F.3d at 954.

Petitioner's procedural competency claim is based upon a combination of factors which occurred in his trial. First, petitioner argues that trial counsel was ineffective for failing to follow the advise of his mental health expert and raise the issue of his competency prior to allowing his trial to begin. Second, he claims the trial court should have halted his trial and ordered a competency evaluation. Additionally, he asserts his retrospective competency proceeding was inadequate to protect his right not to be tried while incompetent.[6] Finally, he states he was deprived of effective assistance of appellate counsel

---

[6]Respondent asserts procedural bar prevents this Court from considering this issue. While the OCCA found the issue was waived because it could have been raised on direct and was not, *Ryder v. State*, No. PCD-2002-257, slip op. At p. 3 (Okla. Crim. App. March 18, 2004) this Court finds this was the exact issue raised in the petitioner's direct appeal. The OCCA ruled

during the retrospective competency proceeding. First, the Court will address the adequacy of the retrospective competency proceeding. The remaining issues will be discussed in more detail in subsequent sections of this opinion.

### *Adequacy of retrospective competency hearing*

While the Supreme Court has questioned whether retrospective competency hearings can remedy due process violations, there is no Supreme Court decision forbidding them *per se* on a constitutional basis.[7] "Although generally disfavored, retrospective competency hearings are not forbidden." *United States v. Bergman*, 599 F.2d 1142, 1148 (10th Cir. 2010) (citations omitted). Rather, they are permissible "whenever a court can conduct a meaningful hearing to evaluate retrospectively the competency of the defendant." *Moran v. Godinez*, 57 F.3d 690, 696 (9th Cir.1994); *see Drope v. Missouri*, 420 U.S. 162, 180–83, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975).

> A 'meaningful' determination is possible where the state of the record, together with such additional evidence as may be relevant and available, permits an accurate assessment of the defendant's condition at the time of the original state proceedings." *Reynolds v. Norris*, 86 F.3d 796, 802 (8th Cir.1996). A court should consider (1) the passage of time, (2) the availability of contemporaneous medical evidence, including medical records and prior competency determinations, (3) any statements by the defendant in the trial record, and (4) the availability of individuals and trial witnesses, both experts and non-experts, who were in a position to interact with defendant before and during trial, including the trial judge, counsel for both the government and

---

against the petitioner when it remanded the case for a retrospective competency hearing. Therefore, this Court finds the issue has been exhausted and is properly before this Court.

[7]The Court recognizes that the Supreme Court has expressed skepticism about retrospective competency opinions and hearings in several older decision. *See, Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (*per curiam*); *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); and *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975).

defendant, and jail officials. *See Reynolds*, 86 F.3d at 802–03; *Moran*, 57 F.3d at 696.

*Clayton v. Gibson*, 199 F.3d 1162, 1169 (10th Cir. 1999).

In this case, the passage of time from the jury trial to the retrospective competency hearing was less than three years.[8] The only mental health professional to have evaluated the petitioner at the time of his trial was available and, in fact, testified at the retrospective competency hearing. Additionally, the petitioner's statements during his trial were available, as well as individuals who interacted with the defendant before and during the trial, including the trial judge. Although trial counsel did not testify at the retrospective competency hearing, there is nothing in the record to indicate they were not available, if they had been subpoenaed.

The OCCA found a retrospective competency evaluation was feasible and sufficient to ascertain that the petitioner was not incompetent at the time of his original trial. In reaching this decision, the OCCA made the following findings of fact regarding the evidence presented at the retrospective competency hearing:

> . . . . . At the jury trial held on March 13, 2003, [Petitioner] presented the testimony of one witness, Dr. Dean P. Montgomery, PhD., a licensed psychologist. Dr. Montgomery testified he interviewed [Petitioner] in 2000 while [Petitioner] was incarcerated in the county jail prior to trial. Dr. Montgomery stated the interview took place at the sheriff's office and lasted

---

[8]*See*, *Clayton v. Gibson*, 199 F.3d 1162, 1168-1169 (10th Cir. 1999), *cert. denied*, 531 U.S. 838, 121 S.Ct. 100, 148 L.Ed.2d 59 (almost six years elapsed between trial and retrospective competency hearing); *cf.*, *e.g.*, *Drope v. Missouri*, 429 U.S. 162, 183, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) (determining there could not be a meaningful retrospective competency determination after six years); *Pate v. Robinson*, 383 U.S. 375, 377, 387, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) (same); *McGregor v. Gibson*, 248 F.3d 946, 963 (10th Cir. 2001) (finding meaningful retrospective competency hearing could not be held after eleven years in light of minimal contemporaneous medical evidence) and *Bruce v. Estelle*, 536 F.2d 1051, 1057 (5th Cir. 1976), *cert. denied*, 492 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (finding nine year gap between trial and competency hearing was not enough to vitiate opportunity for meaningful hearing).

for approximately four to five hours.  Dr. Montgomery testified that during that time period he conducted a clinical interview and gave [Petitioner] several different psychological tests.  Dr. Montgomery stated that his conclusions in 2000 were that [Petitioner's] "competency was certainly questionable."  Dr. Montgomery testified his conclusion was based upon [Petitioner's] lack of cooperation with counsel in refusing to identify a witness that might have been helpful to his case, refusing any plea agreements, and refusing to allow the participation of any family members in presenting mitigating evidence.  Dr. Montgomery testified that [Petitioner] demonstrated a "schizoid personality disorder" which is characterized by extreme disinterest in relationships with other people.

Dr. Montgomery also testified that since [Petitioner's] trial, he had read the trial transcripts and in 2002 interviewed [Petitioner] again.  He said the additional information confirmed his conclusion that [Petitioner] suffered from a severe delusional disorder.  Dr. Montgomery stated that [Petitioner's] grandiose delusions manifested themselves in a preoccupation with the Fourth Commandment to keep the Sabbath holy.  On cross-examination, Dr. Montgomery made it clear that his opinion was based on [Petitioner's] lack of cooperation with counsel and not any unusual religious beliefs [Petitioner] may have.

The State presented three witnesses.  Charlie Rogers was a field deputy for the Pittsburg County Sheriff's Department in 2000.  He testified he transported [Petitioner] from the county jail to the courthouse each day for trial.  During that time period he remained with [Petitioner] the entire day, including sitting in the courtroom during trial.  Mr. Rogers testified he never observed any bizarre behavior from [Petitioner].  He described [Petitioner's] conduct at trial as "real tentative, kind of was listening, . . .Acted like he was well-educated and watched what was going on."  Mr. Rogers said he never discussed the facts of the case with [Petitioner], but [Petitioner's] answers to questions concerning current events, the weather, or sports were responsive and coherent.

The Honorable Thomas Bartheld, the trial judge in [Petitioner's] case, also testified.  He testified the State had made an offer to [Petitioner] to recommend two concurrent life sentences in exchange for a guilty plea.  When [Petitioner] rejected the offer, the trial judge questioned [Petitioner] under oath about his decision.  Judge Bartheld testified that at no time during pre-trial and first stage proceedings did [Petitioner] indicate he might not understand what was happening.  He said that during trial, counsel would often consult with [Petitioner].  Judge Bartheld said there was nothing in [Petitioner's] conduct during the entire trial that gave any indication that he was not competent to stand trial.  He said if there had been any indication [Petitioner] was not

competent, he would have stayed the proceedings until the issue could be resolved.

Judge Bartheld testified the issue of [Petitioner's] competency was not raised until the second stage of trial. He stated that when the issue was brought to his attention he questioned [Petitioner] extensively and allowed defense counsel to question [Petitioner]. Judge Bartheld testified that during defense counsel's questioning it became clear there was a dispute between [Petitioner] and counsel concerning [Petitioner's] desire not to present mitigating evidence and his decision to reject the State's offer of two concurrent life sentences. Judge Bartheld testified he questioned [Petitioner] for over an hour and addressed all of his trial rights and appeal rights. He said [Petitioner] indicated he understood the three possible punishments, the purpose of the second stage of trial and of mitigating evidence. He said [Petitioner] was very opposed to his family testifying, and did not want anyone "begging for his life." He said [Petitioner] said more than once that he would rather die than spend the rest of his life in prison. However, this did not give him any reason to question [Petitioner's] competency based upon [Petitioner's] history. He said [Petitioner] had accumulated certain goods over a period of time so he could travel to the Yukon. Judge Bartheld said [Petitioner] killed the victims in this case because he believed they had taken his possessions. Judge Bartheld testified he could understand [Petitioner] would not want to spend the rest of his life in an 8 x 10 foot cell. Judge Bartheld stated that [Petitioner] never gave any indication he did not understand the nature of the proceedings against him or that he was not competent to continue with his trial.

The final witness for the State was Charlie Mackey, a special agent with the OSBI in 2000. Agent Mackey testified he traveled to Hall County Georgia where [Petitioner] was incarcerated in order to get a sample of his blood. Agent Mackey said he read [Petitioner] his *Miranda* rights and [Petitioner] requested an attorney. Agent Mackey said when he asked [Petitioner] if he would voluntarily give up his blood, [Petitioner] refused and asked to see the court order. Agent Mackey testified that at no time did [Petitioner] give the impression that he did not understand what was happening. Agent Mackey also testified that he attended the preliminary hearing, an evidentiary hearing, and the trial in this case. He said [Petitioner] never exhibited any bizarre behavior and never gave any indication he did not understand the proceedings. Although he could not overhear what [Petitioner] was saying to his counsel, Agent Mackey said [Petitioner] wrote notes and conferred with counsel throughout the trial.

At the close of the testimony, the court instructed the jury, and counsel gave their closing arguments. The jury subsequently returned a verdict finding

[Petitioner] was not incompetent to undergo further criminal proceedings at the time of his original trial.

*Ryder v. State*, 83 P.3d, at 867-868.

After considering these findings of fact as well as the actual testimony at the retrospective competency hearing, this Court is convinced there was sufficient evidence available to provide the petitioner with a meaningful competency hearing. Therefore, this Court finds that Petitioner has failed to establish that the OCCA decision was contrary to, or involved an unreasonable application of Supreme Court law or resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. Accordingly, this claim is denied.

### B. *Substantive competency claim*

Petitioner alleges he was tried, convicted and sentenced to death while incompetent. Despite petitioner's current mental incompetency (approximately thirteen years after his jury trial), the jury at the retrospective competency hearing found that Ryder was competent at the time of his trial. Petitioner argued on appeal that the evidence was insufficient to find him competent at his retrospective competency trial. He premised his argument on the fact that he presented a mental health expert and the State did not. The State did, however, as set forth above, have testimony from several lay witnesses who had interacted with the petitioner during his criminal trial. The OCCA rejected petitioner's claim holding:

> The evidence in this case shows [Petitioner] understood the nature of the charges against him and had the ability to assist counsel in his defense at his trial in 2000. Any rational trier of fact could have found from the evidence

presented that [Petitioner] had not proven his incompetence by a preponderance of the evidence.

*Ryder v. State*, 83 P.3d, at 870. Since competency is a factual issue,[9] this Court's review is very limited. The state court's finding of competency is afforded a presumption of correctness unless petitioner rebuts the presumption by clear and convincing evidence. *Wallace v. Ward*, 191 F.3d 1235, 1243 (10th Cir. 1999). *See also*, *Bryan v.Gibson*, 276 F.3d 1163, 1172 (10th Cir. 2001) *vacated in part on other grounds sub nom. Bryan v. Mullin*, 335 F.3d 1207, 1211 (10th Cir. 2003)(en banc).

This case presents a unique claim in that counsel did not raise any question of competency until **after** the petitioner was found guilty. *Ryder v. State*, 83 P.3d at 865. Furthermore, the issue of substantive competency in this case can be quite easily confused by the fact that this Court held a competency hearing, at the request of petitioner's counsel, in which it was determined that the petitioner currently suffers from "schizophrenia, paranoid type, a deteriorating psychiatric disorder, which has continually gotten worse since his conviction and it is unlikely that his mental illness will remit spontaneously in the absence of anti-psychotic medication." Dkt. # 150. However, a review of the records at the time of trial, leave this Court with no doubt that petitioner was competent during the second stage of his trial.

According to the records, trial counsel contracted with Dr. Dean Montgomery, a licensed forensic psychologist to perform testing and evaluation of Mr. Ryder's competency

---

[9] *See Profitt v. Waldron*, 831 F.2d 1245, 1250 (5th Cir. 1987) (pre-AEDPA case affording presumption to jury's competency finding).

prior to trial. On April 21, 2000, two weeks before the trial was scheduled to begin, Dr.

Montgomery issued a report to trial counsel which stated that he believed that Mr. Ryder was

"incompetent to assist in his own defense, due to a long standing personality disorder." O.R.

417-420. Trial counsel, without advising the trial court, proceeded to trial. After Mr. Ryder

was convicted of two counts of first degree murder, but prior to the second stage of trial, trial

counsel filed an application for competency determination which advised the trial court about

Dr. Montgomery's report. O.R. 415-420.

When court reconvened, outside the presence of the jury, counsel advised the trial

court that, in addition to the evaluation conducted by Dr. Montgomery, "counsel has

concerns because of Mr. Ryder's failure to assist us in any type of preparation as to the

second stage and his refusal to allow us to put on any second stage evidence that he is not

able at this time to assist counsel." *See* J.T.Tr. Vol. V, at p. 1100. Counsel further advised

the court, based upon the report and "the information we have received from his mother, it

appears that Mr. Ryder is suffering from depression and has not gotten any treatment for

that." *Id.*[10] As noted by the OCCA in considering petitioner's ineffective assistance of

counsel claim for failure to raise this issue before trial began:

> . . . .the record reflects counsel did not have a "good faith doubt" as to
> [Petitioner's] competence to stand trial. In fact, counsel admitted as such (sic)
> when the application for competency determination was first raised at the
> beginning of second stage. Counsel admitted to having the psychological

---

[10]While the court noted for the record that what the defendant's mother told defense counsel was not evidence, the defendant's mother was allowed to testify before the court made its final decision. J.T. Tr. Vol. V, at pp. 1143-1147. According to Ms. Ryder, the petitioner was "very depressed." *Id.*, at 1143. Family members pleaded with the petitioner to let them testify as to what a good person he was, but according to Ms. Ryder, the petitioner said "he would rather die rather than spend the rest of his life in jail." *Id.*, at p. 1147.

evaluation prior to trial, but stated he had no questions about [Petitioner's] competency until [Petitioner] refused to assist in the presentation of mitigating evidence in second stage. Counsel was not required to request a competency determination based solely upon the findings in the psychological evaluation. In this case, [Petitioner] was apparently lucid and rational and did not give counsel any reason to question his competence to stand trial.

*Ryder v. State*, 83 P.3d, at 876.

The transcript of the trial court proceedings substantiate the OCCA's findings. In considering what course of action to take, the trial court made the following statements on the record which are relevant in ascertaining whether a reasonable judge should have entertained a "bona fide doubt" as to the petitioner's competency during the state court trial:

. . . I would make the observation on the record that this report was in the hands of the defense Counsel since April the 21st, that prior to beginning trial, we made a record. The State offered Mr. Ryder two life sentences to run concurrent. Mr. Ryder was here. He was present and we made a record and Mr. Ryder waived. He declined, refused to accept that offer. We made that record.

I would further make the observation that throughout the trial from voir dire on including after - - well, defense counsel has consulted with Mr. Ryder through voir dire. He helped select the jury which is proper. And after questioning every witness, [defense] counsel always asked for a second. It was granted. You went over and asked the attorney that was not questioning the witness and then consulted with Mr. Ryder if he had any other questions to be asked.

If defense counsel had concerns about his competency prior to trial, while you had this report prior to trial, it should have been raised prior to trial. I think procedurally what I need to do is inquire of Mr. Ryder pursuant to the <u>Wallace</u> case[11] and pursuant to these statutes 22 1175.2[12] (sic) regarding his competency, regarding his desires, and then make a determination of whether or not the application should be granted.

_____

[11]*Wallace v. State*, 893 P.2d 504 (Okla. Crim. App. 1995).

[12]Okla. Stat., tit. 22 § 1175.1-1175.8 (West 1999).

I will not just summarily grant it because defense Counsel filed it. I think I have a duty and a responsibility and an obligation under the law, statutory and case law to at least make an inquiry of Mr. Ryder at this point.

J.T.Tr. Vol. V, at pp. 1106-1107.

Thereafter, defense counsel admitted, on the record, that he had the psychological

evaluation prior to the start of trial. However, he advised the trial court that

. . . . . .the issue of competency only goes to the second stage issues. If I had had any question as to Mr. Ryder's competency as to first stage, then we would have been before you. It's only as we tried to prepare for the second stage where he's told us that he's not going to present anything. He's not going to allow us to present anything that we felt it necessary in conjunction with the evaluation to present this to the Court.

*Id.*, at p. 1108.

The trial court then explained it's reasons for denying the defendant's request for a

competency hearing stating:

Mr. Ryder has a right not to present any evidence simply because he doesn't wish to present any evidence. And for the record, he's nodding his head as I speak in the affirmative. He has that right. That doesn't make him incompetent. That does not make him incompetent simply because he does not wish to present any evidence.

As I made a rather lengthy record last week on the State calling witnesses, in that hearing I observed that the defendant has certain rights, that certain things were not fair to the defendant and that certain things were not fair to the victim's family and the State of Oklahoma. That holds true today just as in every trial.

The people of the State of Oklahoma has (sic) a right to a fair trial just as the defendant does. Defendant has had a fair trial. He's had very effective assistance of Counsel.

Mr. Corgan, you and Ms. Tyner have done a great job for Mr. Ryder but I don't think simply filing an application that the Court calls a halt to this proceedings (sic) and ties the State's hands in proceeding in the second stage. That's not fair to the people of the State of Oklahoma.

And if Mr. Ryder is competent and wishes to proceed today and not present any mitigating evidence, he has that right also. So I'm going to make inquiry of Mr. Ryder. I'm going to ask that you make inquiry of him. You're his attorney. And that I will make any further inquiry that I feel is necessary.

Now, this inquiry is limited to his wishes today as far as the second stage presenting evidence, his right to testify, his rights to appeal from the verdict that has already been entered and whatever sentence is imposed, whether or not he's consulted thoroughly with Counsel, whether or not he understands all those rights. I will not let inquiry, obviously, by the State into merits of this case, facts of the case or anything else. It will be solely limited to those issues and I think that is what is required by the State under the <u>Wallace</u> case.

*Id.*, at pp. 1106-1110. *See also*, Court minutes from May 8, 2000, O.R. 506.

After further arguments, Mr. Ryder was sworn in as a witness and the following examination occurred between defense counsel and Mr. Ryder:

Q:     Would you state your full name, please.

A:     James Ryder.

Q:     Mr. Ryder, you are the defendant in this case; is that correct?

A:     Yes.

Q:     And you have been convicted and found guilty by the jury of two counts of first degree murder; is that correct?

A:     Yes.

Q:     Mr. Ryder, would you tell me your understanding of what happens in the second stage of the trial?

A:     Y'all beg for my life and the State tries to beg them to kill me.

Q:     And do you have any understanding of what an aggravating circumstance is?

A:     No, I don't know what you're talking about there.

Q:     Do you know what a mitigating circumstance is?

A:     No.

Q:     Have your attorneys, myself and Ms. Tyner, talked to you about the area of mitigation?

A:     I told you I didn't know what that meant.

Q:     Okay.  Have you been advised by Ms. Tyner and myself that you have a right in the second stage of this hearing to put on evidence as to why you should not receive the death penalty?

A:     That's right.

Q:     And what is your position in that regard?

A:     I ain't going to beg them for nothing.

Q:     Well, do you understand, sir, that that would - - we are talking about not you begging for something but we're talking about - -

A:     There ain't nobody going to let them do what they want.

Q:     Sir, let me finish my question.  Okay.  You understand that we have developed witnesses that we feel could present evidence in regard to mitigation or in regard to reasons why you should not receive the death penalty?

A:     All you're going to do is get me a life sentence without parole and I don't want that.  I'd rather have the death penalty.

Q:     Okay.  Well, let me be a little more clear with my question.  Do you understand, sir, that we have developed - - we have found witnesses. Witness that are here.  Witnesses such as Sue Eply.  Witnesses such as your mother.  Witnesses such as your brother.  Witnesses such as Sue Watkins of the Pittsburg County Jail who are available to come into this courtroom and present testimony to this jury as to the reasons why you should not receive the death penalty?

A:     That's right and I don't want them to do it.

Q:      Why is that, sir?

A:      I just told you.  Because you're just going to get me life without parole
        and I would rather have the death penalty.

Q:      Now, have we presented to you and talked to you and by we I mean
        Ms. Tyner and myself.  Have we talked to you about your right to call
        these witnesses.

A:      I know I have the right to refuse it.

Q:      No.  Let me make sure you understand my question.  Have we talked
        to you about your right to present these witnesses?

A:      I have told you from the get-go that I wasn't going to fight the second
        stage if I was found guilty.  I have told you this all along.

Q:      Let me try one more time and if my question is not clear, please tell me
        and please answer my question.  Have Ms. Tyner and myself told you
        that we have witnesses who are willing to come forward and present
        evidence as to why you should not receive the death penalty?

A:      Yeah, you've told me.

Q:      Do you have any questions about that in your mind as to what their
        testimony would be?

A:      It don't matter.  I don't want them to testify and that's the bottom line.

Q:      Let me try my question again.

A:      I'm not going to sit up here and put up with your questions.  Just take
        me to jail.  I ain't (sic) sit here and put up with these questions.  We've
        been over this a thousand times.

                              * * * * *

MS. TYNER:      Can I ask you some questions?

MR. RYDER:      Yeah, yeah.  Maybe you will get to the core of
                this.  I don't want to talk to you either.  Just let the

Judge get to the bottom of this. I'm plenty competent. I know just what's going on. I've been here. All they're going to do is give me life without parole if they get up here and beg for my life. I do not want that. I would just (sic) soon have the death penalty. I've told them from the get-go that I didn't want to fight this if we lose it and they won't leave it alone.

J.T.Tr. Vol. V, at pp. 1112-1116.

Thereafter, the following colloquy occurred between the court and Mr. Ryder:

Q:    Mr. Ryder, what I have to do - - and let me explain why I'm asking these questions. My purpose is not to upset you or make you mad. I have to ask these questions in order for me to do my job, okay?

Mr. Ryder, I have watched you during the court proceedings and you've been assisting your attorney, have you not?

A:    That's right.

Q:    I understand from your testimony here today that, and correct me if I'm wrong, you don't want to run the risk of getting a life without parole sentence?

A:    That's right.

Q:    That's the bottom line; is that correct? Let me go through this with you and I have to do this for the record. You understand that the State of Oklahoma has filed a Bill of Particulars in this case and you've gone over that with your attorneys?

A:    Yeah.

Q:    At this stage of the proceedings, the State is alleging - - these are just the allegations and I don't know that any of these aggravators they are alleging three aggravators and that goes to Mr. Corgan's question.

This is exactly what the State is alleging and I don't know if any of these will make it to the jury. The first is - - I'm just going to

32

read it.  The defendant knowingly created a great risk to more than one person.

Second the murder was especially heinous, atrocious, or cruel.

Third, the existence of probability that the defendant would commit criminal acts, of violence that's what they filed.  Do you understand what each one of these mean?

A:     Yes, sir.

Q:     Any questions about that?

A:     Huh-uh.

Q:     You as the defendant have certain rights and that's why you're sitting here right now.  You have a right to present what Mr. Corgan is (sic) called mitigation evidence.  Mitigation simply means you have a right to present evidence to a jury to ask the jury not to impose the death sentence.

A:     Right.

Q:     Some of those factors that you can present and I'm going to read them from the jury instructions and I don't know if all these apply or if any of them apply.  I just want to read them to you so you'll know what you can present.  Is that okay?

A:     Uh-huh.

Q:     You can present evidence that you don't have any prior criminal activity.  You can present evidence, if you have it, in all of these.  If you have the evidence that you acted under duress and domination of another person, that the defendant's capacity to appreciate the criminality of his conduct.  The defendant was under the influence of emotional or mental disturbance.  That the victim was a willing participant in defendant's conduct and circumstances that tend to justify excuse or reduce the crime.

The defendant's emotional family history those are things you can present under the law of the State of Oklahoma to the jury in the second stage proceeding, do you understand?

A:     Uh-huh.

Q:     Do you have any questions about what you can present?

A:     No.

Q:     Okay. You understand that if - - well, you can appeal any verdict, any sentence that this jury renders, the finding of guilt and including any of the punishments. Do you understand that?

A:     Uh-huh.

Q:     If you do get the death sentence, you understand that is an automatic appeal. That will automatically be reviewed by the Court of Criminal Appeals?

A:     Uh-huh.

Q:     You understand that they can - - if I have made any errors as a trial judge, they can send that (sic) case back for another trial?

A:     Yeah.

Q:     You understand that if they find errors that don't amount to a new trial but require reducing your sentence, they can order me to conduct a new sentencing hearing or they could actually reduce the sentence themselves. Do you understand that?

A:     Uh-huh.

Q:     You understand that you have a right to be represented on those appeals by a court appointed lawyer?

A:     Right.

Q:     And last week would you agree with me, sir, that you waived the State's offer of two life sentences concurrently?

| | |
|---|---|
| A: | That's right. |
| Q: | And you wished to proceed to trial last Monday a week ago today. |
| A: | That's right. |
| Q: | Do you understand all your rights as you sit here today? |
| A: | Yes, sir. |

*Id*., at pp. 1116-1120.  Following this discussion with the defendant, the court had counsel

provide the names of available witnesses as well as a synopsis of their testimony in order that

the defendant would understand the mitigating evidence that could be presented on his

behalf.  During the course of counsel's presentation, the defendant became upset and stated:

> I've heard all I need to.  No, if you - - take me out.  I'm not listening to no more.  No.  Take me out or get me out of here.  Get me out of here.  I do not want any second stage.  Nobody to testify.  And if I don't have that right, then get me out of here.

*Id*., at p. 1128.  The defendant advised the court the presentation by counsel was "not

necessary."  He further stated: "It's just plain and simple.  I'm competent.  I understand.  I

don't want no second trial.  No defense about it.  All this is just a bunch of nosey shit that's

nobody's business."  *Id*., at p. 1130.  At which point, the following colloquy occurred

between the judge and Mr. Ryder:

| | |
|---|---|
| Q: | I understand.  Your bottom line desire is you don't want to take the chance of getting a life without parole sentence. |
| A: | That's right. |
| Q: | And you've talked it over with - - |

A:     They offered me a life.  I didn't accept it.  There's no way I'm going to get it.  All I got now is two chances and I don't want that.  Give me life and let me get it over with.  I mean, give me death.

Q:     It is possible for you to get a life sentence.

A:     Let them do it if they want to, but I ain't going to get up here and beg them and nobody else is.

Q:     You've talked over this second stage and all this evidence with your attorneys?

A:     I know all of that.

Q:     You know all about it and you understand the witnesses they intend to offer and what they're going to say?

A:     Right.  Don't want no (sic) offer nothing.  Let them do what they want to do and hear what the State has got to say and let them make their decision.

Q:     You understand that - - well, you have already told me that you've assisted your attorneys up to this point.

A:     Right.

Q:     And are you still assisting them or are you telling them what - -

A:     I'm telling them what I don't want and they're going over my head.

Q:     You understand that you also have a right to testify if you should wish to do so - at the second stage.

A:     I don't care to testify.

Q:     And you understand that you have that right, though?

A:     Right.

Q:      You have the right to present these witnesses that Ms. Tyner listed.

A:       Uh-huh, and I choose not to.

*Id*., at pp. 1130-1132.

Furthermore, the judge ascertained that the defendant had never been hospitalized or treated for any kind of mental illness. *Id*., at p. 1133. Despite this extensive questioning, the defendant insisted that he wanted to give up his rights to present mitigating evidence and proceed with the trial. Thereafter, the trial court denied counsel's request for a competency hearing stating:

> I don't think it's necessary to proceed with the competency hearing. Mr. Ryder has a right to proceed without mitigating evidence. He understands mitigating evidence. He understands the importance of mitigating evidence. Mr. Ryder would prefer to have a life sentence with the possibility of parole and getting out of prison or the death sentence. He does not wish to be sentenced to life without parole and in all honesty, I can't say that I blame him.
> I understand what he's telling me and I believe I understand why. If I was sitting in Mr. Ryder's shoes, I'm not sure that I'd take the same position that he's taking. I don't know because I'm not there, but I'm not sure that I would not take the same position he's taking. I believe he's competent and he understands what his rights are.
> He understands - - I've gone over his appellate rights, his right to an attorney, his right to testify, his right to present this evidence, what it is, what the evidence is, that it can be used possibly to prevent the death penalty. He has understood me clearly.
> According to his testimony, he has had no prior problems with mental health. I understand why defense counsel has done it, but the fact that he does not want to present mitigating evidence does not make him incompetent.

*Id*., at pp. 1136-1137. *See also*, O.R. 507.

Although documents submitted by habeas counsel indicate the petitioner "resisted the recommendations of his counsel and became agitated and stormed out of the courtroom on

at least one occasion,"[13] the transcript reflects he told the trial judge he did not want to hear his mother testify and the court allowed him to leave during her testimony. The transcript also reflects, however, that the trial court judge advised Mr. Ryder that he could waive his presence during the second stage and counsel could go ahead and Mr. Ryder indicated he wanted to be present, he just didn't want to put on evidence in the second stage. J.T.Tr. Vol. V, at pp. 1135-1136. When trial counsel insisted on putting on two witnesses, the trial judge asked the petitioner if he wanted to remain in the courtroom and the petitioner said no and the judge allowed him to leave the courtroom until after their testimony. *Id.*, at pp. 1200-1201. The Tenth Circuit Court of Appeals has long recognized that "[t]he presence of some degree of mental disorder in the defendant does not necessarily mean that he is incompetent to assist in his own defense." *United States v. Mackovich*, 209 F.3d 1227, 1233 (10th Cir. 2000)(direct criminal appeal)(citations omitted). *See also*, *Bryan v. Gibson*, 276 F.3d 1163, 1170-1171 (10th Cir. 2001) *vacated in part on other grounds sub nom. Bryan v. Mullin*, 335 F.3d 1207 (10th Cir. 2003).

Petitioner has failed to rebut by clear and convincing evidence the OCCA's finding of competency, the contemporaneous records during his jury trial and/or the evidence presented to the jury who determined he was competent during his retrospective competency trial. As a result, this Court finds the OCCA's holding is not contrary to nor an unreasonable application of Supreme Court law nor was it an unreasonable determination of the facts in

---

[13]Dkt. # 13-3, at p. 8.

light of the evidence presented in the State court proceedings. Accordingly, the petitioner's substantive competency claim is denied.

## 2. Ineffective Assistance of Counsel

In his second ground for relief, Petitioner asserts trial counsel failed to fully investigate his background and recognize his incompetence and, therefore, he was denied his Sixth Amendment right to effective assistance of counsel. Petitioner alleges compelling evidence could have been discovered by trial counsel and if it had been presented to the jury, there is a reasonable probability that the result of the second stage would have been different. Petitioner bases this argument on the premise that he was not competent to stand trial and/or assist trial counsel during the second stage of trial. Petitioner further claims the OCCA's basis for denying relief is an unreasonable application of the facts and contrary to clearly established Supreme Court precedent. Respondent argues Petitioner's claim of failing to investigate his background is procedurally barred.

Assuming Petitioner's claim is not barred,[14] this Court would still deny relief. It can not be disputed that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v. Washington*, 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984). The importance of competent representation during the penalty phase of a capital trial cannot be

---

[14]*Lambrix v. Singletary*, 520 U.S. 518, 525, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997) (reasoning that the federal courts may ignore a complicated "procedural-bar issue" where the merits are "easily resolvable against the habeas petitioner") and *Romero v. Furlong*, 215 F.3d 1107, 1111 (10th Cir. 2000) (declining to address procedural bar "because the case may be more easily and succinctly affirmed on the merits").

understated. This is particularly true with respect to the duty to investigate, since practically speaking all that stands between a defendant who has been convicted of capital murder and a death sentence is whatever mitigation evidence he presents.

However, the fact remains that counsel does not render ineffective assistance by complying with his client's express wishes not to present mitigating evidence. In *Schriro v. Landrigan*, 550 U.S. 465, 127 S.Ct. 1933, 1941, 167 L.Ed.2d 836 (2007), the Supreme Court held that a death eligible defendant who instructed counsel not to introduce any mitigating evidence could not establish that he was prejudiced by counsel's failure to present such evidence. Based upon the facts of this case, this Court finds Petitioner has failed to establish any prejudice as a result of counsel's failure to more fully investigate his background and present that evidence to the jury in mitigation.

Since Petitioner failed to rebut the OCCA's finding of competency, this Court finds counsel was not ineffective for failing to investigate Petitioner's background more fully and present the very evidence which the Petitioner, by exercising his constitutional rights, precluded his attorney from presenting. If this court were to hold otherwise, a defendant would no longer have the constitutional right to waive presentation of mitigating evidence. Therefore, the OCCA's holding that the petitioner had "failed to show either deficient performance by counsel or prejudice from counsel's conduct,"[15] is neither contrary to Supreme Court law nor based upon an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim is denied.

---

[15]*Ryder*, 83 P.3d at 878.

### 3. Impartiality of Jury

In his third ground for relief, Petitioner asserts the trial court violated his right to an impartial jury by removing potential jurors for cause based upon their inability to consider all three available punishments equally. Respondent argues this claim is procedurally barred and should, therefore, not be considered.

Petitioner first raised this issue during his state post-conviction application. In considering this issue, the OCCA found because the issue could have been raised on direct appeal, the petitioner had waived the issue. Since the petitioner argued that his appellate counsel was ineffective for failing to raise this issue, the OCCA looked to the merits of the omitted issue holding:

> . . . . Petitioner has failed to show that the claim was even "arguably meritorious". In support of his argument, Petitioner references the dismissal for cause of three prospective jurors with citations to the trial transcript. Petitioner has not shown that the jury actually impaneled to try his case was not fair and impartial. Therefore, Petitioner has not established a reasonable probability that, but for his appellate attorneys' unprofessional errors, the result of his appeal would have been different. Accordingly, Petitioner has not established that appellate counsel's performance was deficient. Therefore, his claim of ineffective assistance of appellate counsel has no merit and his substantive claim remains procedurally barred.

*Ryder v. State*, No. PCD-2002-257, slip op. at pp. 19-20 (Okla. Crim. App. March 18, 2004).

In *Steele v. Young*, 11 F.3d 1518, 1521 (1993), the Tenth Circuit found Oklahoma's post-conviction rule[16] barring review of claims that could have been raised on direct appeal including issues involving fundamental, constitutional rights, to be an "adequate, as well as

---

[16]22 O.S. Supp. 1995, § 1086.

independent, state ground" which would bar federal habeas review. *See also*, *Ellis v. Hargett*, 302 F.3d 1182, 1186 (10th Cir. 2002); *Hain v. Gibson*, 287 F.3d 1224, 1230 (10th Cir. 2002). Thus, this court is precluded from reviewing the underlying claim unless the petitioner can demonstrate both "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

Petitioner attributes cause for his procedural default, in this court as he did in the OCCA, to ineffective assistance of counsel. In order for the petitioner to prevail, he must establish that it was 1) objectively unreasonable for appellate counsel to not raise this claim on direct appeal, and 2) if the claim had been raised, he would have prevailed in his direct appeal. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003). A claim of appellate counsel ineffectiveness for failure to raise an issue on appeal is difficult to establish since counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288, 120 S.Ct. 746, 765, 145 L.Ed.2d 756 (2000).

In *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the Court indicated that prospective jurors in a capital case should be excluded if they make it

> unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward

the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*.

*Id.*, at U.S. 522, n. 21, 88 S.Ct. 15 1777 n. 21.  (Emphasis in original).  Thereafter, in *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980), the Court held

> [A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as juror in accordance with his instructions and his oath.  The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

In *Patton v. Yount*, 467 U.S. 1025, 1036, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984), the Court held that the impartiality of a juror is a question of fact.  Additionally, in *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court indicated a trial judge's factual determination as to a potential juror's bias should be accorded a presumption of correctness pursuant to 28 U.S.C. § 2254(d).  *See also*, *Davis v. Executive Dir. of Dep't of Corrections*, 100 F.3d 750, 777 (10th Cir. 1996), *cert. den.*, *Davis v. Zavaras*, 520 U.S. 1215, 117 S.Ct. 703, 137 L.Ed.2d 828 (1997).  "[T]he question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are fairly supported by the record."  *Id.*, 469 U.S. at 434, 105 S.Ct. at 857.  Since issues of credibility and demeanor are critical to a trial judge's decision regarding removal of a juror, review of such decisions is quite deferential.  *Castro v. Ward*, 138 F.3d 810, 824 (10th Cir. 1998).

In this case, the petitioner challenged the removal of three jurors for cause asserting that the trial judge's questions to the potential jurors were confusing and misleading and thus

lead to the dismissal of jurors who were competent to serve on the jury. Specifically, the petitioner claims the judge's instruction to the jurors that they needed to give "equal" consideration to all three punishments lead to the dismissal of jurors who were not "irrevocably committed to one sentence." Thus, Petitioner claims he was sentenced by a jury "that was more likely to sentence him to death because jurors who may have been able to consider death as legally required but were more likely to consider a sentence less than death were excused for cause." A review of the trial court transcript reveals the overall context in which each of the three challenged jurors was removed. In removing the first juror, the following colloquy occurred:

> THE COURT:      Ms. Bogard, if you find the defendant guilty of murder in the first degree, can you give equal consideration for all three of these legal punishments?
>
> JUROR:      No.
>
> THE COURT:      If you will approach please.
>
> (The following bench conference was had outside the hearing of the jury:)
>
> THE COURT:      Ms. Bogard, you indicated no, which can you not do?
>
> JUROR:      The death penalty.
>
> THE COURT:      Now, the law is such that you must if seated as a juror?
>
> JUROR:      I understand that.
>
> THE COURT:      You must give equal consideration. So I am going to I use the word absolute, you understand what I mean by absolute.
>
> JUROR:      Yes.

| | |
|---|---|
| THE COURT: | Okay. I am going to use that word, if you find beyond a reasonable doubt the defendant was guilty of murder in the first degree and if under the evidence and the facts and circumstances of the case are such that the law would permit you to consider the sentence of death, are your reservations about the death penalty absolutely so strong that regardless of the law, the facts and the circumstances of the case that you could not impose the death penalty? |
| JUROR: | I - - if they hurt a child or somebody that was incapable of (sic) elderly person or an infant. |
| THE COURT: | Okay. So there is a situation where you could impose the death peanlty, consider it? |
| JUROR: | In those two circumstances I could and I don't know anything about this case or these two people but I would have a big problem with the death penalty. |
| THE COURT: | Okay. I believe the evidence, I anticipate what the evidence will show is one of the victims was an elderly person and once again, it's (sic) I am not asking you? |
| JUROR: | I understand that, Judge. But I am just trying to be honest. |
| THE COURT: | That's what we are looking for, that's exactly what we are looking for. The only way is will you give equal consideration and you impose what you believe? |
| JUROR: | I could put him in jail without parole that would not bother me at all, but for the other part sentence (sic) - - I don't anything about the case I really can't say. I am just telling you that I have a problem. |
| THE COURT: | It's okay. That you have a problem. The law is you just consider it you impose it if you are selected as a juror and your verdict and you impose what you believe the law, the facts and the evidence support. Can you give equal consideration to all three? |

| | |
|---|---|
| JUROR: | No. |
| THE COURT: | Mr. Hull. |
| MR. HULL: | Ms. Bogard, you have indicated that you cannot give equal consideration to all three, that is life without parole, life and the death penalty? |
| JUROR: | I really honestly don't believe I could be impartial to all three of them, I don't. |
| MR. HULL: | The State would move for challenge for cause. |
| MR. CORGAN: | If I understand, I am not arguing with you. |
| JUROR: | I understand. |
| MR. CORGAN: | If I understand correctly what you told the Judge your reservations about the death penalty are not such that you can quivically - - unquivically (sic) tell us there are no circumstances that you would consider it. In fact you gave us a couple of examples; is that right? |
| JUROR: | Uh-huh. |
| MR. CORGAN: | Now, I anticipate the Judge will tell you through his instructions as he already has there are three possibilities. There is life, life without parole, and the death sentence and I guess the question I need to ask you is knowing those are options, could you consider each of those, listen to the evidence in that regard and talk to your fellow jurors about those particular punishments? |
| JUROR: | I know what you are saying to me - - I know what you are saying to me and I have been a legal secretary for a lot of years and in my heart there are those two cases, if it's an infant I know or if it's somebody that cannot help themselves. I can probably put them to death myself but I really really have a problem giving somebody a death penalty, and like I said I don't know anything about this case but if you are saying equally between those three |

|              |                                                                                          |
|--------------|------------------------------------------------------------------------------------------|
|              | there is always going to be that little edge there that is not equal.                    |
| MR. CORGAN:  | I don't think I have any further questions at this time, Judge. I don't know if you want to hear her response to? |
| THE COURT:   | No, Ms. Bogard, I take you back to the word absolute and are your reservations absolutely so strong that regardless of the law the facts and circumstances that you cannot impose the death penalty? |
| JUROR:       | I can deliberate and I won't put him to death and I don't want to be sitting there by myself. |
| THE COURT:   | Of course that can happen in any case?                                                   |
| JUROR:       | I know.                                                                                  |
| THE COURT:   | What I want to focus your attention on is whether or not those reservations are so absolute that you could not give consideration? |
| JUROR:       | I would have to say they are so absolute.                                                |
| THE COURT:   | Okay. Thank you if you will have a seat.                                                 |
| MR. HULL:    | Your Honor, at this time the State would move to challenge her for cause. She said, if I understand her correctly, her position was absolute. |
| MR. CORGAN:  | Judge, I don't think she has established for the record that she cannot be a juror in the case. I think what she left us with and why she finally said absolute was her concern that she might be badgered by the other jurors as to her feeling, and I think the court will probably cover that with the perspective jurors and I know if the court doesn't that I certainly intend to get into that and she has told us on the record that there are some circumstances in which she could consider the death penalty and of course one of those applies in this case. So I think she can - - she has not reached the point that she is so against the |

|              | death penalty that she should be excused for cause and we would object to that. |
|--------------|--------------------------------------------------------------------------------|
| THE COURT:   | What she said was she could impose it if it was a killing of a child or someone that couldn't defend themselves. I don't know what the evidence is going to show about Ms. Hallum but where the argument ends is when these jurors tell me their position is so absolute and she agreed with me she understood what the word absolute meant and her final response to my question was it was absolute. When a juror says they are absolutely not going to impose it I have to take her at her word and I am going to grant the State's request to excuse her. |

J. Tr. Vol. I, at pp. 92-97.

Thereafter, the following questions were asked of potential Juror Clark:

| THE COURT:   | Ms. Clark, if you find the defendant guilty of murder in the first degree, can you give equal consideration for all three of these legal punishments. death, imprisonment for life without parole or imprisonment for life and impose the one warranted by the law and evidence? |
|--------------|--------------------------------------------------------------------------------|
| JUROR:       | May I approach, sir. |
| THE COURT:   | Yes. |

(The following bench conference was had outside the hearing of the jury:)

| JUROR:       | I don't think I would be able to give the death penalty to anybody. I couldn't carry that with me for the rest of my life if I did that. |
|--------------|--------------------------------------------------------------------------------|
| THE COURT:   | Let me ask you this, if you are selected as a juror if you find beyond a reasonable doubt that the defendant was guilty of murder in the first degree and if under the evidence the facts and the circumstances of the case the law would permit you to consider a sentence of death. Are your reservations about the death penalty absolutely so strong that regardless of the law, the facts and the |

circumstances of the case that you could not impose the death penalty?

JUROR:           I couldn't make that judgment.  I mean I couldn't give some punishment the death penalty.  I know I couldn't do that.

THE COURT:       So your reservations are so absolutely strong you could not impose the death penalty?

JUROR:           No.

THE COURT:       Could you give equal consideration to the death peanlty, life without parole and imprisonment?

JUROR:           I couldn't give consideration to the death penalty.

THE COURT:       Okay.  Mr. Hull.

MR. HULL:        No questions.

MR. CORGAN:      Ms. Clark, can you conceive of any circumstances in which there might be a case that a fact scenario in which you could consider as a possible punishment the death sentence?

JUROR:           I guess, it's not that I don't see where some punishments fit the crime.  It's just that I personally could not do that.

MR. CORGAN:      Let me ask you this, if you are selected as a juror that you will not be instructed that a death sentence is mandatory but rather what the court is asking is could you consider each one of those possible punishments and so my question for you knowing that you will never be required, no one will instruct you and say Ms. Clark you have to do that can you consider the law and the law is possible punishments are death, life without parole or life, could you consider all of those?

JUROR:           I don't believe so.

THE COURT:     Thank you.  Ms. Clark, you are free to go. . . . .I am going to go ahead and excuse her for cause.

*Id.*, at pp. 104-106.  Finally, the following colloquy occurred with potential Juror Daniels:

THE COURT:     Ms. Daniels, if you find the defendant guilty of murder in the first degree, can you give equal consideration to all three of these punishments?

(The following bench conference was had outside the hearing of the jury:)

JUROR:     I don't know that I can hand down death to any one.  I don't believe but - -

THE COURT:     Hang on a second.  Let me use the word absolute.  You know what I mean by the word absolute?

JUROR:     Uh-huh.

THE COURT:     Okay.  If you find beyond a reasonable doubt that the defendant was guilty of murder in the first degree and if under the evidence, the facts and circumstances of the case the law permits you to consider a sentence of death. Are your reservations about the death penalty absolutely so strong that regardless of the law, the facts and circumstances of the case you could not impose the death penalty?

JUROR:     Could I say this, if it were against a child I could.  There is just some things I probably could hand down the death penalty but others I couldn't.  It wasn't - - it would have to be a very strong case against him.  I really don't believe any man should have any right to kill any man. I mean it puts us (sic) the same level as them.

THE COURT:     I understand.  This question is not and never will be whether or not you're for or against the death penalty. The question is simply if you can consider all three of those options and weigh as a juror weigh the law, the facts and circumstances and then consider all three?

| | |
|---|---|
| JUROR: | I can't say for sure. I can't because I don't know if I could hand that down. I guess, what is bad - - what is bad that if it was against a child I would have no hesitation. If it was against one of my family members I would have no hesitation, and I know that is kind of - - it's wrong to but whatever he did it would have to be very bad if he did it - - if he was convicted - - if we do convict him and he definitely did it I don't know that I could. I can't give you a definite answer. |
| THE COURT: | No, ma'am, not at all? |
| JUROR: | I just don't know, I don't know if I could look him in the eye. I don't know if I could be apart of that. |
| THE COURT: | There is no right or wrong answer, please understand that, and you are not going to make me mad. You are not going to make Mr. Hull or Mr. Corgan or Ms. Tyner mad. |
| JUROR: | Uh-huh. |
| THE COURT: | Our whole purpose and mission today is to select a jury that will be fair and impartial? |
| JUROR: | I could do that. |
| THE COURT: | This is in (sic) a first degree murder case there is a bill of particulars in place. If he's found guilty - - if he's found guilty whether or not if selected as a juror, can you consider those three punishments. I am not asking you neither one of those attorneys are going to ask you, because I won't let them. I am not going to ask you because it's not proper to make you commit to give Mr. Ryder the death penalty or life or life without parole. The law is just whether or not you could consider that punishment? |
| JUROR: | I could consider the other two but I couldn't consider completely and hundred - - a hundred percent death. |

THE COURT:	So you're saying your reservations are absolutely so strong that regardless of the law that I give you the facts in this case as they come out in court and the circumstances in this case that you could not impose the death penalty?

JUROR:	No, because I believe his punishment would be worse if he was behind bars for the rest of his life for whatever he may have done.

THE COURT:	So you cannot impose the death penalty?

JUROR:	I couldn't be a part of that.

THE COURT:	I'm sorry.

JUROR:	I couldn't be a part of that. I couldn't be a part of killing someone because that's how I believe it would be.

THE COURT:	Mr. Hull, any questions.

MR. HULL:	No questions, your Honor.

MR. CORGAN:	First off, I won't ask you to challenge your beliefs or thoughts on the death penalty, but only try to look at the parameters of the law and where you could fit within those parameters. If I understand, you have told us already that there are some circumstances in which you could consider the death penalty. Obviously, you don't know anything about this case but my question for you is, at the end of the trial if you found the defendant guilty it would go into the second stage and there would be evidence presented. Could you at that time follow the instructions of the court if we get that far, follow his instructions as to these are the possible punishments and would you be willing to talk to your fellow jurors to discuss the evidence with them and consider each one of those possible punishments?

JUROR:	I think I could only consider two of them. I don't think I could consider the death.

THE COURT:        Okay.

JUROR:            I am not trying to be difficult.

THE COURT:        No, that's quite all right.  Mr. Hull.

MR. HULL:         I have no questions.  I would challenge for cause.

THE COURT:        I grant the State's challenge for cause. . . . . .

*Id.*, at pp. 111-116.

        After reviewing the entire voir dire, this Court finds nothing to support Petitioner's

claim that the jurors were improperly removed for cause.  As can be seen from the voir dire,

all three of these jurors views about the death penalty would have substantially impaired their

ability to fully consider all three punishment options.  Although Bogard and Daniels implied

they might be able to consider the death penalty in very limited situations, the trial court was

in the best position to assess the juror's credibility and to resolve any ambiguities.  The

petitioner has failed to rebut by clear and convincing evidence the presumption that the trial

court was correct in finding that the jurors' views would have prevented or substantially

impaired the performance of their duties as jurors.  Thus, the OCCA's determination that the

petitioner's claim was not meritorious is not an unreasonable application of *Witt* or *Adams.*

        As a result, this Court finds the OCCA's decision that appellate counsel was not

ineffective for failing to raise this issue on appeal is not contrary to nor an unreasonable

application of *Strickland.*  Accordingly, this Court finds petitioner's attempt to overcome the

OCCA's procedural bar must fail. This claim remains procedurally barred. Therefore, Petitioner is not entitled to relief on this issue.

### 4. Collateral Estoppel

Petitioner alleges, in his fourth ground for relief, that the trial court's failure to strike the continuing threat aggravator related to the murder of Daisy Hallum violated the principle of collateral estoppel since the trial court had stricken this aggravator in relation to the murder of Sam Hallum. Petitioner first raised this issue on direct appeal and the OCCA found the trial court incorrectly sustained the petitioner's demur to the "continuing threat" aggravator as it related to the murder of Sam Hallum. The OCCA then considered the Petitioner's collateral estoppel argument in light of *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). In denying the petitioner's claim, the OCCA stated:

> The murders in this case were two separate offenses committed in different ways. The evidence supporting one was not necessarily the same as that supporting the other. Here, the trial court properly considered the murders to be separate and distinct. The judge found the circumstances surrounding the murder of Sam Hallum did not support a finding of [Petitioner's] future dangerousness. The adjudication of this issue by the judge was not the same as adjudicating whether different evidence supported a finding of the existence of the aggravator in the murder of Daisy Hallum.
>
> * * * * * *
>
> Here, the trial court properly considered the two murders separate and distinct offenses. While certain evidence presented by the State overlapped, the manner of killing was different in each instance and therefore formed the basis for the existence of different aggravating circumstances as to each murder. Under the evidence in this case, the doctrine of collateral estoppel was not violated by the trial court's ruling rejecting the aggravator as to one murder but not the other.

54

*Ryder v. State*, 83 P.3d at 873-873.  Respondent asserts this holding is not contrary to nor an unreasonable application of Supreme Court law.

Petitioner argues when the trial judge made his finding regarding the murder of Sam Hallum it is presumed that the court considered all of the evidence including the prior murder of Daisy Hallum.  As a result, the petitioner argues the finding by the trial judge that there was insufficient evidence to support the continuing threat aggravator as to the murder of Sam Hallum, precluded the court from submitting the same issue to the jury for sentencing purposes in the murder of Daisy Hallum.  In support of his argument, the petitioner relies on *Ashe,* and *Sattazahn v. Pennsylvania*, 537 U.S. 101, 123 S.Ct. 732, 154 L.Ed.2d 588 (2003).  This Court, however, finds those cases distinguishable from the facts in petitioner's case.

In *Ashe*, the defendant was tried for the robbery of one of six poker players and found not guilty due to insufficient evidence.  Six weeks later the defendant was again brought to trial.  This time, the defendant was charged with the robbery of another participant in the same poker game.  In discussing the issue of collateral estoppel, the Court indicated where a previous judgment of acquittal is based upon a general verdict, the court must examine the record of the prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.  The Court looked to the transcript of both trials in deciding that the single issue which was contested was whether the defendant was or was not present at the time the money was taken from the poker table and the other property was taken from the persons of the other poker

players. As a result, the Court held the Fifth Amendment's guarantee against double jeopardy prevented the state from retrying the defendant since the first jury, by its verdict, found the defendant had not been one of the robbers.

Thereafter, in *Sattazahn* the defendant was tried and convicted of first-, second-, and third-degree murder, and various other charges. After both sides presented their evidence in the second stage of trial, the jury advised the court they were "hopelessly deadlocked." The trial judge, in accordance with Pennsylvania law, discharged the jury and entered a life sentence. The defendant appealed and the state appellate court reversed the first-degree murder conviction and remanded the case for a new trial. On remand, the State of Pennsylvania alleged not only the aggravating circumstance which had been alleged in the first trial; but also a second aggravating circumstance. At the second trial, the jury again convicted the defendant of first degree murder. This time, however, the jury imposed the death penalty. The Supreme Court held that the appeal prevented jeopardy from attaching so "that the life sentence imposed in connection with the initial conviction raises no double-jeopardy bar to a death sentence on retrial." *Id.*, 537 U.S. at 106, 123 S.Ct. at 737.

In reaching its conclusion, the Supreme Court considered the affect of its decisions in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). The Court then held for purposes of the Double Jeopardy Clause, the offense which petitioner was convicted of during the guilt phase of the proceedings, first-degree murder, was a lesser included offense of "first-degree murder plus aggravating circumstance(s)." *Sattazahn*, 537 U.S. at 112, 123

56

S.Ct. at 740. The Court went on to say "if petitioner's first sentencing jury had unanimously concluded that Pennsylvania failed to prove any aggravating circumstances, that conclusion would operate as an "acquittal" of the greater offense - which would bar Pennsylvania from retrying petitioner on that greater offense (and thus, from seeking the death penalty) on retrial." *Id.* (citations omitted). Since, however, the Court found the jury deliberated without making any findings regarding the aggravating or mitigating circumstances, there was no double jeopardy bar to retrying the petitioner on both the lesser and the greater offense because his "jeopardy" never terminated with respect to either. *Id.*, 537 U.S. at 113. The Double Jeopardy prohibition considered in both *Ashe* and *Sattazahn* apply only to an individual's right not to be placed twice in jeopardy for the same offense.

In this case two separate murders occurred and petitioner was tried for both in a single trial. Petitioner appears to be arguing that where the evidence was insufficient to support an aggravating circumstance alleged against one of the victims, the evidence necessarily was insufficient to support the aggravating circumstance against both victims. These two murders, however, were carried out in completely different manners. Daisy Hallum was severely beaten about the head and face causing injuries so severe and massive that her brain stem was almost torn in two. This one fact clearly distinguishes the murder of Ms. Hallum from that of her son who was shot with a shotgun as he walked toward his residence. Oklahoma case law has found the callousness of the murder for which the defendant was convicted can be considered in determining if the defendant poses a continuing threat to society. *Gilson v. State*, 8 P.3d 883, 925 (Okla. Crim. App. 2000). *See also*, *James v.*

*Gibson*, 211 F.3d 543, 559 (10th Cir. 2000) ("The most compelling evidence supporting continuing threat can come from the facts surrounding the murder itself.") The fact that the jury heard evidence about both murders in a single trial did not require the jury to find the same aggravating factors as to each murder. Rather, the jury was required to find aggravating circumstances outweighed mitigating evidence as to each murder separately before it could impose the ultimate punishment on either of the two murder convictions. Furthermore, in light of the OCCA's finding that the trial court erred in striking the aggravator in relation to Sam Hallum's murder, jeopardy did not attached to said issue. *Sattazahan*, 537 U.S. at 113, 123 S.Ct. at 740.

Therefore, based upon the particular facts in this case, including the fact the petitioner was tried for two murders in a single trial, this Court finds the decision of the OCCA was not contrary to nor an unreasonable application of Supreme Court law. Accordingly, pursuant to 28 U.S.C. § 2254(d), this claim is denied.

## 5. Sufficiency of Evidence re: Aggravating Circumstances

A. Continuing Threat Aggravator

In his fifth ground for relief, Petitioner claims insufficient evidence was presented to support the continuing threat aggravator and, therefore, he was sentenced to death in violation of the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. Petitioner argues that the only evidence supporting this aggravating factor was "the brutal and calloused manner in which both Sam Hallum and Daisy Hallum were murdered." Dkt. # 13, at 85. On direct appeal, Petitioner argued that the evidence was insufficient to support

the continuing threat aggravator. Respondent argues that Petitioner has failed to exhaust his

Eighth Amendment claims[17] and has failed to establish that the state court's adjudication on

his Fourteenth Amendment claim resulted in a decision that was contrary to or involved an

unreasonable application of clearly established Federal law as determined by the United

States Supreme Court.

A review of Petitioner's direct appeal brief reveals that he raised an insufficiency of

the evidence claim in his seventh proposition on direct appeal. Petitioner did not cite to

either the Eighth or Fourteenth Amendment. He did, however, refer the Oklahoma Court to

the case of *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct 2781, 2789, 61 L.Ed.2d 560

(1979), regarding the test for sufficiency of the evidence under the Due Process Clause of the

Fourteenth Amendment.

On appeal, the OCCA found the continuing threat aggravating circumstance to be

sufficiently supported by the evidence stating:

> "When the sufficiency of the evidence of an aggravating circumstance is
> challenged on appeal, the proper test is whether there was any competent
> evidence to support the State's charge that the aggravating circumstance
> existed." "In making this determination, this Court should view the evidence
> in the light most favorable to the State."
>
> In evaluating whether there is a probability that the defendant will
> commit acts of violence which will constitute a continuing threat to society,
> we have held that the murder for which the defendant was convicted can be
> considered as supporting evidence. * * * * * In determining the callousness
> of the crime, the defendant's attitude is critical to the determination of whether

---

[17]Petitioner's argument that "allowing the continuing threat aggravator to be supported only by the callous nature of the crime fails to genuinely narrow the class for crimes for which the death penalty may be imposed" in violation of *Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994), has no merit. *See*, *James v. Gibson*, 211 F.3d 543 (10th Cir. 2000), *cert. denied*, 531 U.S. 1128, 121 S.Ct. 886, 148 L.Ed.2d 794 (2001); and *Cooks v. Ward*, 165 F.3d 1283, 1289 (10th Cir. 1998), *cert. denied*, 528 U.S. 834, 120 S.Ct. 94, 145 L.Ed.2d 80 (1999).

he poses a continuing threat to society. A defendant who does not appreciate the gravity of taking another's life is more likely to do so again.

In the present case, the State presented no evidence of a prior criminal history. Therefore we look to the circumstances surrounding the murder of Daisy Hallum. The victim was a 70 year old woman who weighed only 123 pounds. She was first attacked in the living room of her home, possibly as she was lying down. Her glasses were found on the floor near the sofa. Blood was scattered throughout the residence indicating a struggle had occurred. She had 18 lacerations on her head caused by blunt force blows. Her cheekbones and nose were broken. She suffered a skull fracture. The injuries to her brain were so severe and massive her brain stem was almost torn in two. Many blows were inflicted while her head lay on the ground. There was also evidence of defensive wounds. Her fingers were broken and almost torn off. These injuries indicated the victim tried to defend herself by putting her hands up to cover her head and face. After beating the victim to death, [Petitioner] dragged her body outside and left her in the grass. [Petitioner] then waited for Sam Hallum. As Hallum walked towards his residence, [Petitioner] shot him, repeatedly, with a shotgun. [Petitioner's] brutal bludgeoning of 70 year old Daisy, and his lying in wait to kill Sam Hallum clearly shows the callous nature of the murder and that [Petitioner] has a propensity to violence, which makes him a continuing threat to society. Accordingly, this assignment of error is denied.

*Ryder*, 83 P.3d at 873 (citations omitted).

The United States Supreme Court held, in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), *reh. denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), a federal habeas proceeding challenging the sufficiency of the evidence in a state trial, a reviewing court must decide "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Further, the Court indicated following conviction, a judicial review of the "evidence is to be considered in the light most favorable to the prosecution." *Id.* In *Lewis v. Jeffers,* 497 U.S. 764, 110 S.Ct. 3092, 111

L.Ed.2d 606 (1990), the Supreme Court adopted the standard set out in *Jackson* for use in the review of sufficiency of evidence claims relating to aggravating circumstances. While the *Lewis* court recognized that aggravating circumstances are not "elements" of any offense, the court indicated "the standard of federal review for determining whether a state court has violated the Fourteenth Amendment's guarantee against wholly arbitrary deprivations of liberty is equally applicable in safeguarding the Eighth Amendment's bedrock guarantee against the arbitrary or capricious imposition of the death penalty." *Lewis*, 497 U.S. at 782, 110 S.Ct. at 3103.

Under Oklahoma law, the continuing threat aggravator required the jury to find "[t]he existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." OKLA. STAT. ANN. tit. 21, § 701.12(7). After carefully reviewing the evidence in the light most favorable to the state, this Court finds any rational juror could have found this aggravating factor beyond a reasonable doubt. According to the medical examiner's testimony, Daisy Hallum was beaten to death sustaining numerous defensive wounds to her hands while trying to protect her head. J.T.Tr. Vol. Iv, at pp. 862-887 and 901-905. Anyone capable of beating a seventy year old, 123 pound woman to death as viciously as was done to Daisy Hallum, could easily be a considered a continuing threat to society. Therefore, this Court finds Petitioner has failed to demonstrate that the OCCA's decision was contrary to, or an unreasonable application of the *Lewis/Jackson* standard, or that it was based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, habeas relief is denied on this ground.

B.  Great Risk of Death Aggravator

Petitioner argues in his sixth ground for relief that the evidence was insufficient to support the great risk of death aggravating circumstance.  Since the State failed to prove how much time elapsed between the two murders, the Petitioner claims the State failed to prove that the murders were committed in close enough proximity to support this aggravator.  Petitioner claims this error violated his Sixth, Eighth and Fourteenth Amendment rights.  On direct appeal, Petitioner argued that the evidence was insufficient to support the great risk of death aggravator and the OCCA adjudicated the issue on the merits.  Respondent states the issue is exhausted for purposes of federal habeas relief and may, therefore, be reviewed on the merits by this Court.[18]

Again, this court must ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the [presence of the aggravating factor] beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789.  This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Id*.  Under *Jackson*, this Court's review is "sharply limited."  *Messer v. Roberts*, 74 F.3d 1009, 1013 (10th Cir. 1996).  This Court must "accept the jury's

---

[18]Nothing in the briefs filed in the OCCA by the petitioner regarding this proposition references any denial of his constitutional rights.  See, Original Brief for and On Behalf of James Chandler Ryder, Appellant, Case No. CF-1999-147, filed July 24, 2001.  Since, however, Petitioner did cite to *Jackson* in his proposition regarding the sufficiency of the evidence in his earlier proposition regarding the continuing threat aggravator, this Court will deem that sufficient to consider this issue exhausted.

resolution of the evidence as long as it is within the bounds of reason." *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993).

In considering this issue, the OCCA indicated

[The 'great risk of death'] circumstance is proved by a defendant's acts which create a risk of death to another 'in close proximity, in terms of time, location, and intent' to the killing. The gravamen of the circumstance is not the number of persons killed, but the callous creation of the risk to more than one person.

*Ryder*, 83 P.3d at 874. Additionally, the Tenth Circuit has held, under Oklahoma law, that killing more than one person is sufficient to support this aggravator. *Turrentine v. Mullin*, 390 F.3d 1181, 1198-1199 (10th Cir. 2004).

Thereafter, the OCCA found this aggravating circumstance sufficiently supported by the following evidence:

The exact time between Daisy Hallum's death and Sam Hallum's death was not established in this case. What the State did establish was that Cindy McCord saw [Petitioner] on April 4 carrying a long shotgun and a pistol tucked in his belt. She did not see him again until April 8 when he told her "the less you know the better." That evening, [Petitioner] showed up at McCord's house with a finger "shot off." McCord had warned [Petitioner] that Sam Hallum was dangerous and not someone to "reckon with". The State's evidence showed [Petitioner] beat Sam's mother to death with the knowledge that Sam would be looking for him as a result. [Petitioner] killed Daisy then waited at the Hallum residence for Sam to return home. He shot Sam as he walked towards the front door. The two murders in this case were in close proximity and were sufficient to prove [Petitioner] created a great risk of death to more than one person.

*Ryder*, 83 P.3d at 874.

Petitioner claims the OCCA unreasonably applied the facts to the law. Specifically, Petitioner argues to prove the murder of Daisy Hallum created a great risk of death to Sam

Hallum, the state was required to prove that Daisy's murder occurred first. Then, without any citation to the trial transcript, the Petitioner argues the medical examiner was unable to determine the time of death for either person and he could not determine which victim died first. *See*, Dkt. # 19, at p. 30. Finally, Petitioner asserts even if it "were true Daisy Hallum died first, it is likely several hours separated the murders and the attacker formed separate intents for each murder." *Id.* While the Court did not find any testimony regarding the exact time of death for either victim, the medical examiner testified that he didn't "have any indication that they were killed at different times." J.T. Tr. Vol. IV, at p. 906.

As a result, based upon all of the evidence at trial, this Court finds the decision of the OCCA was not contrary to nor an unreasonable application of Supreme Court law. Additionally, this Court finds the OCCA's factual findings were not an unreasonable determination of the facts in light of the all of the evidence presented. 28 U.S.C. § 2254(d)(1)-(2). Accordingly, this claim for relief is denied.

### 6. Jury Instructions

In his seventh ground for relief, the petitioner claims the trial court improperly instructed the jury by not requiring the jury to find the aggravating circumstance(s) outweighed the mitigating evidence beyond a reasonable doubt thereby denying his constitutional rights to a fair sentencing determination in violation of the Oklahoma Constitution and the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Basically, the petitioner is arguing that the Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and *Ring v.*

*Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which require a jury to find, beyond a reasonable doubt, any fact that increases the maximum penalty, required the jury in this case to determine whether aggravating factors outweighed mitigating factors beyond a reasonable doubt. Petitioner first raised this issue in his application for post-conviction relief. In denying this claim, the OCCA relied on its prior decision in *Torres v. State*, 58 P.3d 214 (Okla. Crim. App. 2002) which held "Oklahoma's provision that jurors make the factual finding of an aggravating circumstance beyond a reasonable doubt is all that *Ring* requires." *Id.*, at 216.

In *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007), *cert denied*, 552 U.S. 1260, 128 S.Ct. 1646, 170 L.Ed.2d 359 (2008), the Tenth Circuit Court of Appeals rejected an identical argument finding that "the jury's decision that the aggravating factors outweigh the mitigating factors is not a finding of fact. Instead, it is a 'highly subjective,' 'largely moral judgment' 'regarding the punishment that a particular person deserves. . . .'" *Id.*, at 1107 (citing *Caldwell v. Mississippi*, 472 U.S. 320, 340 n. 7, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). *See also*, *Matthews v. Workman*, 577 F.3d 1175 (10th Cir. 2009), *cert. denied*, 559 U.S. 1014, 130 S.Ct. 1900 (2010). Accordingly, Petitioner has failed to establish that the decision of the OCCA is contrary to or an unreasonable application of Supreme Court law. Therefore, this claim is denied.

### 7. Prosecutorial Misconduct

Petitioner alleges in his eighth ground for relief that misstatements of the law regarding aggravating circumstances "infected the sentencing proceeding with unfairness

resulting in a denial of due process and undermined the reliability of the death sentence" and deprived the petitioner of the "heightened reliability required under the Eighth and Fourteenth Amendments," thereby increasing the "likelihood the jury's sentencing determination was based on arbitrary factors." Dkt. # 13, at p. 106. Respondent concedes that the petitioner argued to the OCCA in his direct appeal that the prosecutor improperly misstated the law thereby depriving him of a fair sentencing hearing. Respondent argues, however, that the petitioner failed to raise his "heightened reliability" claim and that it is, therefore, unexhausted.

In considering petitioner's claim of prosecutorial misconduct, the OCCA rejected this claim on the merits. The OCCA's decision is, therefore, entitled to deferential review under the AEDPA standard. *Parker v. Matthews*, — U.S. —, 132 S.Ct. 2148 2153, 183 L.Ed.2d 32 (2012). *See also*, *Harrington v. Ritcher*, — U.S. —, 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011).

Inappropriate prosecutorial comments in closing arguments, standing alone, do not justify a reviewing court reversing a criminal conviction obtained in an otherwise fair proceeding. *United States v. Young*, 470 U.S. 1, 11-12, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). Rather, such comments must be viewed with the context of the trial to determine whether such comments created prejudicial error. *Id.* In *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 91986), the Supreme Court held that a prosecutor's improper comments will be held to violate the Constitution only if they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.*, 477 U.S.

at 181, 106 S.Ct. at 2471 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Moreover, "the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process and not the broad exercise of supervisory power.'" *Id.* The fundamental fairness inquiry can only be made after an examination of comments within the context of the entire proceedings. *Donnelly*, 416 U.S. at 643, 94 S.Ct. at 1871.

In denying the petitioner's claim, the OCCA found that the isolated comment did not deny the Petitioner a fair sentencing proceeding. Furthermore, the OCCA considered the comment in the context of the entire closing argument, holding:

> . . . . the challenged comment was an isolated remark. The jury was properly instructed on the law concerning the aggravating circumstances. No challenges have been raised to these instructions. [Petitioner] has not rebutted the presumption that juries are presumed to follow their instructions. *Zafiro v. United States*, 506 U.S. 534, 450, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993); *Turrentine*, 965 P.2d at 968. [Petitioner] has failed to show that when the challenged comment is read in context of the entire closing argument, and considered in light of the instructions given to the jury, that he was denied his right to a fair sentencing proceeding.

*Ryder*, 83 P.3d at 875. After reviewing the comment in the context of the entire trial proceedings, this Court finds that the Petitioner has not established that the decision of the OCCA is contrary to or an unreasonable application of Supreme Court law. As a result, this claim is denied.

## 8. Competency to be Executed

In his tenth ground for relief, Petitioner claims his execution would violate the Eighth Amendment because he is incompetent to be executed. Petitioner recognizes that this claim

is not yet ripe for review; but raises this claim to preserve the issue once his execution becomes imminent. *See*, *Stewart v. Martinez-Villareal*, 523 U.S. 637, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998) (Competency to be executed claim asserted in initial petition should be adjudicated when execution is imminent, since that is when claim becomes ripe for review.)

Accordingly, this Court hereby dismisses this claim as premature.

## 9. Lethal Injection

In his eleventh proposition of error, Petitioner argues Oklahoma's policies and protocols regarding lethal injection violate the Eighth and Fourteenth Amendments to the United States Constitution.[19] Respondent argues Petitioner has not raised this issue to the OCCA and, therefore, the claim is unexhausted. Thus, Respondent urges this Court to find the claim is procedurally barred and not properly before this Court.

Petitioner claims, however, that he has shown "good cause" for not raising this issue previously because there was no way for him to know the procedure which would ultimately be used in his execution. Specifically, Petitioner claims the information only became available on January 12, 2004, when the State revealed through an affidavit of Warden Mike Mullin certain information regarding Oklahoma's lethal injection procedures. Petitioner admits, however, that "any effort for [petitioner] to exhaust the claim at this point would be futile" since the OCCA has denied relief on the identical issue in *Murphy v. State*, 124 P.3d

---

[19]In the event Oklahoma's lethal injection method were declared unconstitutional, Petitioner asserts that execution under any of the alternative statutory methods would also be cruel and unusual under the Eighth and Fourteenth Amendments. Since this Court does not believe Oklahoma's method of execution by lethal injection is unconstitutional, the constitutionality of alternative methods of execution in Oklahoma have not been considered.

1198 (Okla. Crim. App. 2005). Since the Tenth Circuit recognizes an exception to the exhaustion doctrine where the habeas claim is based on the same constitutional arguments that were rejected by the OCCA in a previous opinion, *Goodwin v. State of Okl.*, 923 F.2d 156, 157-158 (10th Cir. 1991), this Court finds exhaustion would be futile and a waste of judicial resources.

Despite the procedural posture, Petitioner's claim clearly lacks merit. Petitioner alleges that lethal injection causes unnecessary pain and suffering or that any number of accidents could occur with the equipment, personnel, or chemicals involved in the process which might lead to unnecessary pain and suffering. Many other forms of execution which are undoubtedly more painful or intrusive than lethal injection have withstood Eighth Amendment cruel and unusual punishment challenges. *Compare Campbell v. Wood*, 18 F.3d 662, 681-683 (9th Cir. 1994), *cert. denied*, 511 U.S. 1119, 114 S.Ct. 2125, 128 L.Ed.2d 682 (1994) (holding hanging is not cruel and unusual simply "because there may be some pain associated with death"); *Felker v. Turpin*, 101 F.3d 95, 97 (11th Cir. 1996), *cert. denied*, 519 U.S. 989, 117 S.Ct. 450, 136 L.Ed.2d 345 (1996) (holding no merit to Petitioner's claim that death by electrocution constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments); and *Gray v. Lucas*, 710 F.2d 1048, 1061 (5th Cir. 1983), *cert. denied*, 463 U.S. 1237, 104 S.Ct. 211, 77 L.Ed.2d 1453 (1983) (holding the pain and terror

resulting from death by cyanide gas does not render such execution method unconstitutional).[20]

Furthermore, in *Hamilton v. Jones*, 472 F.3d 814 (10th Cir. 2007), *cert. denied*, — U.S. —, 127 S.Ct. 1054, 166 L.Ed.2d 783 (2007), the Tenth Circuit held the petitioner had failed to show "a substantial likelihood of prevailing on the merits" on a similar claim that Oklahoma's lethal injection protocol violates the Eighth Amendment's cruel and unusual punishment prohibition. Accordingly, this Court finds Petitioner's claim is frivolous.

## 10. Cumulative Effect of Errors

Petitioner's ninth ground for relief asserts that the trial court's error in the handling of his competency to stand trial when combined with the other errors raised in his petition demonstrate that he was denied his fundamental right of a fair trial, the right to be free from cruel and unusual punishment and the right to due process of law. Respondent argues that the OCCA's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.

Cumulative-error analysis aggregates all errors found to be harmless and "analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc). Cumulative error analysis applies, however, only if two or more individually harmless errors occurred. *Workman v. Mullin*, 342 F.3d 1100, 1116 (10th Cir.

---

[20]*But see, Hill v. McDonough*, — U.S. —, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006) (holding, without ruling on constitutionality thereof, that cruel and unusual challenge to a particular method of lethal injection was properly raised as § 1983 action).

2003).  Since this Court has not found any errors, Petitioner's sentence is not unconstitutional due to cumulative error.

## V.  CONCLUSION

After a thorough review of the Petition for Writ of Habeas Corpus and Attachments thereto, the Respondent's Response, the Petitioner's Reply and the state court records filed herein, this Court finds Petitioner has failed to establish that he is currently in custody in violation of the Constitution, laws or treaties of the United States as required by 28 U.S.C. § 2254(a).  Therefore, for the reasons stated herein, Petitioner's Petition for Writ of Habeas Corpus (Dkt. # 13) is hereby denied.  Additionally, pursuant to Rule 11 of the Rules Governing Section 2254 cases, this Court hereby denies a certificate of appealability.  The Clerk is hereby directed to enter a separate judgment in this matter.

**ACCORDINGLY IT IS HEREBY ORDERED THAT:**

1.  Anita Trammel is substituted as the party Respondent and the Court Clerk is directed to note such substitution on the record.

2.  Petitioner's request for habeas relief (Dkt. # 13) is denied.

3.  The Court hereby denies a certificate of appealability.

**It is so ordered on this 11th  day of October, 2013.**

James H. Payne
United States District Judge
Eastern District of Oklahoma